cc: ack

**ORIGINAL**

David Lawton (HI Bar No. 7338)
GALLAGHER & GALLAGHER
1925 Century Park East, Suite 950
Los Angeles, CA 90067
Telephone:  (310) 203-2600
Facsimile:  (310) 203-2610
E-mail: dlawton@thegallaghergroup.com

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 02 2011

at 3 o'clock and 05 min. P M.
SUE BEITIA, CLERK

Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

KAHEA and
FOOD & WATER WATCH, INC.

                    Plaintiffs,

     v.

NATIONAL MARINE FISHERIES
SERVICE; MICHAEL D. TOSATTO,
in his official capacity as Regional
Administrator of the National Marine
Fisheries Service, Pacific Islands
Regional Office; ERIC C. SCHWAAB,
in his official capacity as Assistant
Administrator of the National Marine
Fisheries Service; and GARY LOCKE, in
his official capacity as Secretary of
Commerce,

                    Defendants.

Civil Action No. CV11  00474 ACK KSC

COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF

# I.  INTRODUCTION

1.  Plaintiffs KAHEA and Food & Water Watch, Inc. ("FWW"),
(collectively "Plaintiffs"), on behalf of their members, hereby challenge the
Special Coral Reef Ecosystem Fishing Permit that the National Marine Fisheries
Service ("NMFS"); Regional Administrator of NMFS Pacific Islands Regional
Office ("PIRO") Michael D. Tosatto; Assistant Administrator of the National
Marine Fisheries Service ("NMFS") Eric C. Schwaab; and the Secretary of
Commerce Gary Locke ("the Secretary"), (collectively "Defendants"), issued to
Kona Blue Water Farms, Inc.  ("KBWF") on July 6, 2011.  The one-year permit is
the first-ever commercial fishing permit issued for an aquaculture facility in federal
waters.  It will allow KBWF to operate a free-floating fish farm in a vast area off
the western coast of the Island of Hawaii ("Hawaii Island") in order to propagate
an estimated 8,000 pounds of fish for commercial sale and distribution – at the
peril of the surrounding marine environment and the cultural, aesthetic,
recreational, and commercial interests of the Plaintiffs' members.

2.  Plaintiffs ask that the Court immediately declare the permit illegal and
enjoin it because it violates the Magnuson-Stevens Fishery Conservation and
Management Act ("MSA"), 16 U.S.C. § 1853(b)(1)(A)-(C) (2006).  Moreover, the
permit should also be declared invalid because Defendants failed to produce an
Environmental Impact Statement ("EIS"), issuing instead a Finding of No

1

Significant Impact ("FONSI"), violating the National Environmental Policy Act

("NEPA"), 42 U.S.C. §§ 4331-4335 (2006).   Finally, Defendants underwent a de

facto rulemaking process in violation of the Administrative Procedure Act

("APA"), 5 U.S.C. §§ 551-559 (2006).

## II.   JURISDICTION AND VENUE

3.   This case involves claims under the MSA, 16 U.S.C. §§ 1801-1891

(2006); NEPA, 42 U.S.C. §§ 4331-4335 (2006); and the APA, 5 U.S.C §§ 551-

559, 701-06 (2006).

4.   This Court has jurisdiction under 28 U.S.C. § 1331 (2006), which grants

federal district courts "original jurisdiction of all civil actions arising under the . . .

laws . . . of the United States," and supplemental jurisdiction under 28 U.S.C. §

1367 (2006).   Section 1861(d) of the MSA provides that "the district courts of the

United States shall have exclusive jurisdiction over any case or controversy arising

under" the MSA.   16 U.S.C. § 1861(d) (2006).   Section 1855(f) of the MSA allows

for courts to review regulations and actions implementing a fishery management

plan.   16 U.S.C. § 1855(f) (2006).   The APA, under 5 U.S.C. § 702 (2006), entitles

"a person suffering a legal wrong because of agency action, or adversely affected

or aggrieved by agency action within the meaning of a relevant statute, to judicial

review thereof."   Section 704 of the APA states that "agency action made

reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704 (2006).

5. Venue is proper in this Court under 28 U.S.C. § 1391 (e)(1)-(2) (2006) because at least one of the Defendants' official places of business is in this district and a substantial part of the events or omissions giving rise to the claims raised herein occurred in this district.

6. This Court may issue a declaratory judgment in this case pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2006) and may grant relief pursuant to 16 U.S.C. § 1861 (d) (2006), the APA, 5 U.S.C. § 706 (2006), and 28 U.S.C. § 1651(a) (2006).

## III. PARTIES

7. Plaintiff KAHEA is a grassroots community-based organization based in Honolulu, Hawaii. Through education, citizen involvement, and collective action, KAHEA endeavors to protect the sacred lands, native species, and cultural traditions that for generations have defined Hawaii's rich cultural identity and unique beauty. With over 10,000 members including Native Hawaiian cultural practitioners, conservations, and concerned individuals from every island in Hawaii and in different countries around the world, KAHEA and its members are closely involved in safeguarding the health of Hawaii's land and ocean resources. KAHEA advocates for a truly just and sustainable Hawaii, including the need to

3

prevent harm to its marine environment, likely to be caused by sea cage ocean aquaculture.

8. Plaintiff FWW is a national non-profit public interest consumer organization, based in Washington, D.C., which works to ensure safe food and clean water.  Through research, public and policymaker education, media, and lobbying, the organization advocates policies that guarantee safe, wholesome food produced in a sustainable manner.  FWW has advocated against various proposals for permitting marine aquaculture facilities lacking adequate safeguards because of the harm that they can cause to the marine environment and the adverse impacts that they can impose on the well-being of coastal and fishing communities.  FWW has more than 100 dues-paying members in Hawaii.

9. Defendant NMFS is a federal agency under the National Oceanic and Atmospheric Administration ("NOAA").

10. Defendant Michael Tosatto is the Regional Administrator for the PIRO.

11. Defendant Eric Schwaab is the Assistant Administrator for the NMFS.

12. Defendant Gary L. Locke is the Secretary of Commerce, which is the executive department in which NOAA and the Defendant NMFS is housed.

13. The Secretary of Commerce and the NMFS and their employees, individually or collectively, were responsible for the Environmental Assessment

evaluating the potential effects of KBWF's operation on the marine environment

and the issuance of KBWF's Special Coral Reef Ecosystem Fishing Permit.

## IV.   ALLEGATIONS

**A.**   **KBWF's Proposed Project and Defendants' Draft Environmental Assessment**

14. On November 5, 2010, KBWF applied for a Special Coral Reef

Ecosystem Fishing Permit ("SCREFP") from the PIRO in order to facilitate a fish

farming operation.

15. The proposed operation was to consist of two spherical aquaculture

cages composed of brass-mesh netting and connected by tow-lines to an eighty-

foot boat.  After the towing vessel and cages depart from Kawaihae Harbor in West

Hawaii and enter federal waters of the U.S. Exclusive Economic Zone ("EEZ"), a

separate vessel would pump thousands of juvenile fish from its holding tanks into

both cages.  Each cage was to hold approximately 3,000 almaco jack fish, or

*Seriola rivoliana*.  Once stocked with the fingerlings, the cages would be

submerged approximately twenty-five feet under water.  Lacking any specified

course, the tender vessel would then tow the cages anywhere from 3 to 150

nautical miles off the coast of the Island of Hawaii.  After the completion of the

fish's tenth-month growth cycle, the cages would be brought to the surface so that

they could be removed and transferred to shore-side facilities, where they would be

commercially distributed under the brand name, "Kona Kampachi."  KBWF's

application anticipated producing and marketing approximately 20,000 pounds of fish from this operation over the duration of the permit.

16. In a letter dated November 24, 2010, NMFS responded to KBWF's special permit request, acknowledging their receipt of the application and explaining that NMFS must conduct an environmental assessment in accordance with NEPA before granting them the permit.

17. On several occasions during the application process, Mr. Neil Sims, co-founder of KBWF, e-mailed Defendants, pressuring them to issue the permit despite only limited analysis of its likely impacts. In an e-mail to NMFS, dated February 3, 2011, Mr. Sims wrote: "[w]e have cages en route, dock space reserved . . . . The machinations are all scheduled for a Feb. 21st launch date of the cages. *We simply cannot defer the launch"* (emphasis added). A month later, in an e-mail dated March 6, 2011, Mr. Sims reported: "[t]he net pen materials are now on the dock in KWHE . . . . We plan on launching the array later this week . . . we cannot push back the stocking date any further."

18. Defendants did not need much convincing, as they appeared to be dead-set on issuing the permit as quickly as possible, regardless of the project's impacts. Close to a month prior to the agency's issuance of a Draft Environmental Assessment ("the Draft EA"), an employee of NMFS wrote, "need to emphasize limited and small scale" in their notes regarding NMFS's assessment. Similarly,

notes regarding making final edits to the revised EA, dated March 21, 2011, contain a handwritten reminder: "analysis not advocacy."

19. On March 17, 2011, NMFS released the Draft EA for KBWF's requested SCREFP. The Draft EA was posted online and the agency gave members of the public ten days for public comment.

20. While the Draft EA framed the scope of KBWF's aquaculture project as "small-scale," the permit grants KBWF's floating fish farm access to over 7,200 square miles of federal water.

21. To reach this area of ocean from Kawaihae Harbor, the towing vessel and accompanying cages would be required to motor through part of the Hawaiian Islands Humpback Whale National Marine Sanctuary. Support vessels would operate out of both Kawaihae Harbor and Honokohau Small Boat Harbor and traverse through part of Kaloko-Honokohau National Historic Park to reach the facility.

22. The Draft EA acknowledged that this project may affect several threatened or endangered species. A number of protected or endangered species dwell in the waters of West Hawaii both year round and seasonally, including: cetaceans (such as the humpback whale, sperm whale, blue whale, fin whale, and sei whale), sea turtles, seabirds, and monk seals. Numerous animals listed in the Marine Mammal Protection Act also reside here, specifically: pygmy and dwarf

sperm whales, killer whales, false killer whales, pygmy killer whales, pilot whales, melon-headed whales, rough-toothed dolphins, and several species of spotted dolphins.

23. The Draft EA also admitted that the facility may attract fish and other marine species, such as sea turtles and dolphins, thus acting as a fish aggregation device ("FAD").

**B.    FWW's Comments on KBWF's Proposed Project**

24. FWW submitted formal comments on NMFS' Draft EA in a letter dated March 27, 2011.

25. FWW's comments stated that the permit would establish a dangerous precedent, as it would be the first fishing permit issued for a commercial aquaculture venture in federal waters.

26. FWW's comments also questioned NMFS' power to grant such a permit when Hawaii's regional Fishery Ecosystem Plan ("FEP") expressly characterizes aquaculture as a "non-fishing" activity.

27. Additionally, FWW raised concerns that the Draft EA did not adequately consider or address the cultural impacts KBWF's project would have on the West Hawaii coastal community, fishermen, and marine-resources. For example, FWW relayed that the Draft EA erroneously referred to KBWF's "project site" as "remote" when, in fact, the West Hawaii offshore EEZ is a fishing ground for more

than 436 licensed commercial fishermen, utilizing various banks and *Ko'as*, five

FADs, as well as several NOAA buoys.  FWW's comments stated that KBFW's

beliefs that it would be able avoid such areas through charts and technology failed

to acknowledge that all traditional fishing areas would not show up using these

tools.

28. Further, FWW's comments discussed how the Draft EA's findings that

there would be limited cultural impacts from the facility inappropriately relied on

the empirical findings of another aquaculture facility owned by Hawaii Oceanic

Technology, Inc. ("HOTI").  FWW questioned how this information was

applicable to KBWF's project when the HOTI assessment focused on a

substantially smaller and different project area.

29. FWW's comments requested that NMFS deny KBWF's permit

application or, in the alternative, that they extend the ten-day comment period to at

least thirty days and hold a public hearing.  FWW urged NMFS to conduct a full

Environmental Impact Statement that would include:

> [c]onsultation with the Office of Hawaiian Affairs and other Native
> Hawaiian organizations and individuals regarding the cultural impacts.  Full
> review of literature regarding potential impacts of the proposed operation.
> [And] public hearings held along the leeward coast of the Island of Hawaii,
> Hawaii, with adequate public notice.

30. On the same day that FWW submitted these formal comments, March

27, 2011, FWW, KAHEA, and several other organizations re-iterated the above

concerns in two letters, one to PIRO and the other to the White House.

**C.    The WPFMC's Attempt to Amend their FEP's Aquaculture Policy**

31. Notwithstanding the Draft EA's assertions that Defendants had authority to issue the SCREFP for the facility, the Western Pacific Fishery Management Council ("WPFMC") began discussing measures to authorize NMFS's management of offshore aquaculture facilities during the time the Defendants were considering KBWF's SCREFP.  A draft proposed amendment was released on May 20, 2011.

32. Upon information and belief, the proposed amendment erroneously referred to KBWF's project "as one operation recently permitted by NMFS to conduct an experiment in the EEZ utilizing offshore aquaculture technology," notwithstanding that this permit would not be issued for many months.

33. FWW submitted a letter to Ms. Kitty Simonds, Executive Director of the WPFMC, containing their formal comments regarding the proposed changes to the WPFMC's offshore aquaculture policy in an e-mail dated June 13, 2011.  FWW expressed its serious concerns regarding the development of offshore aquaculture in the Western Pacific Region, including KBWF's pending fishing permit.  Among other things, FWW pointed out the numerous known adverse impacts of offshore aquaculture, among which include:  disease transfer between wild and farmed fish populations; depletion of wild fish stocks to feed farmed fish; pollution from fish

wastes and excess feed; fish escapes that can alter and weaken wild fish

populations through intermixing or competition for resources; as well as social and

economic impacts to coastal communities, fishermen, and indigenous peoples.

34. The WPFMC discussed the potential amendment at their 151st Council

Meeting, held June 16-18, 2011; however, they are still in the process of

determining whether and how they would amend their FEP to manage offshore

aquaculture in the Western Pacific region.  Therefore, the current FEP for Hawaii

fisheries still considers aquaculture a non-fishing activity.

**D.    NMFS' Final EA and Issuance of a FONSI**

35. On July 6, 2011, NMFS finalized its Environmental Assessment ("Final

EA") of KBWF's project, granted KBWF's requested permit, and issued a Finding

of No Significant Impact ("FONSI").  They failed to make public the Final EA and

FONSI on their website until almost a week later, on July 12, 2011.

36. The Final EA described the three alternatives considered:  "No Action,"

"Issue a Permit to Kona Blue to Demonstrate the Offshore Cage Culture of *Seriola*

*rivoliana* in the U.S. EEZ" and lastly an "Alternative Considered But Not

Analyzed in Detail."  This third alternative proposed, but ultimately rejected,

issuing an experimental fishing permit (EFP).  Instead, NMFS issued a SCREFP,

making the permit the first-ever commercial fishing permit issued for an

aquaculture facility in federal waters.

37. The Final EA's description of the project revealed several changes to KBWF's proposed fish farm. Instead of utilizing two aquaculture cages, KBWF would only use one because both cages had been "extensively damaged by waves slamming them together" during its experimental phase. The single cage would also be slightly smaller in size than originally proposed (4,662 cubic feet in volume and 21 feet in diameter) and stocked with fewer fish (2,000 instead of 3,000). Consequently, the expected harvest would be 8,000 pounds of Kona Kampachi. KBWF's project would still be allowed to traverse the same area of ocean (7,200 square miles).

38. Although the Final EA mentions the damage caused to both cages during an experimental phase in which the cages were in the water but empty, it fails to disclose the extent of the mishap that occurred in March 2011. A March 29, 2011 news article, published in *West Hawaii Today*, revealed that inclement weather snapped the rigging lines holding the two aquaculture cages to the towing vessel. Subsequently both cages were lost – one sunk in 12,000 feet of water and the other remained adrift but was unable to be immediately located or recovered. This event occurred only a few months after KBWF was fined for damaging coral reef off the Kohala coast with another aquaculture project.

39. The Final EA provides unsubstantial reassurances that "operational protocols are in place" should the rigging line towing the cage snap again, resulting

in another lost cage.  NMFS cursorily explains:  "Basically, Kona Blue would rely on the experienced judgment of the crew of the [tender vessel] to address the issue and follow procedures described in the Velella Project Emergency Reporting Plan."  Instead of outlining proper mitigation measures in response to such an occurrence, this Emergency Reporting Plan only requires that KBWF report any problems to the U.S. Coast Guard and NOAA.

40. NMFS acknowledged that a breakaway cage would likely remain adrift, or, without its float buoys, it would sink.  Yet the Final EA overlooks the navigational hazards of it remaining afloat or the damage to the ocean floor or coral reef if its sinks.  It also fails to consider the potential for ensnaring marine animals in either scenario.

41. The Final EA disregards the potential cultural impacts of the projects, instead concluding that there would not be any large or adverse impacts on "any member of the West Hawaii community" because of the supposedly remote access of the project.

42. The Final EA admits that "[t]he nature of the drifting array is expected to attract various pelagic fish species and other marine species while acting as a [FAD]," yet fails to discuss the environmental, socioeconomic, and cultural impacts from its aggregation of fish to the cage.  Adverse effects on commercial fishermen in the area are likely because they will be prohibited from fishing near

KBWF's facility, even though KBWF's floating FAD will be diverting their
potential catch.

43. Numerous times throughout the Final EA, NMFS claims that it has the
authority to issue KBWF a permit for its aquaculture activities. The Final EA
indicates that the FEP's description of aquaculture as a non-fishing activity is
simply a statement of "best management practices to protect habitat" and these
statements are not to supersede Defendants' authority to issue permits under the
MSA and NOAA policy. NOAA spokeswoman Connie Barclay's statement from
an Associated Press article on July 11, 2011 contradicts this, explaining: "new
[aquaculture] policies establish a framework for allowing marine aquaculture to
expand into federal waters. **But before that can happen, the nation's eight
regional fish management councils must create aquaculture plans for their
regions**." (Emphasis added). Although the WPFMC is reviewing their
aquaculture policies for the Western Pacific Region, its current FEP still
characterizes aquaculture as a "non-fishing" activity.

44. NMFS said it abbreviated the public comment period to only ten days in
order to "meet the applicable deadline for acting on the coral reef ecosystem
permit," even though the regulations for issuing a special permit provide more than
90 days for a decision to be made after an application is submitted, and, even then,
they allow for a delay when issuing a permit in that time period is impracticable.

50. C.F.R. § 665.224 (d)(3)(5) (2011).

## V.  STATUTORY BACKGROUND

### A.    The MSA

45. Congress enacted the MSA in order to "conserve and manage" fishery

resources within the EEZ, including the federal waters off the coast of Hawaii

Island.  As the preeminent authority for the management of fisheries, the MSA

seeks to "prevent overfishing, to rebuild overfished stocks, to insure conservation,

to facilitate long-term protection of essential fish habitats, and to realize the full

potential of the Nation's fishery resources."  16 U.S.C. § 1801(a)(6) (2006).

The MSA established eight regional fishery management councils,

among which is the WPFMC.  *Id.* § 1852(a).  Each fishery management council

must devise, implement, and oversee a fishery management plan ("FMP") for its

region that satisfies the national standards for fishery conservation and

management set out in the MSA.  *Id.* § 1852(h).

46. When an FMP is amended or approved by a regional council, it must go

to the Secretary for approval, *id.* § 1854(b) (2006), along with proposed regulations

implementing the changes, *id.* § 1853(c).  Likewise, modifications to such

implementing regulations must be submitted to the Secretary for approval.  *Id.* §

1853(c)(2).  When the Secretary proposes regulations to implement a Secretarial

FMP, it must submit them to the council for review.  *Id.* § 1854(c)(6).

47. The MSA provides no independent authority to the Secretary or the other

Defendants to issue any domestic fishing permit, except pursuant to an FMP. *See,*

*e.g.*, *id.* §§ 1853-54 (detailing the authority of the Secretary under the MSA).

Rather, the act allows the Secretary to "require a permit to be obtained from, and

fees to be paid to [him or the authorized agency] with respect to" certain fishing

vessels, vessel operators and processors; however, it specifically delineates that

such discretionary management measures can only be authorized pursuant to a

"fishery management plan which is prepared by any Council, or by the Secretary."

*Id.* § 1853(b)(1)(A)-(C).

48. Likewise, the Secretary is limited in his or her rulemaking and action-

taking authority  under the MSA. The Secretary is only authorized to disapprove

proposed FMPs and amendments, *see id.* § 1854(a); prepare FMPs and

amendments when a council fails to do so, *see id.* § 1854(c); force regional

councils to draft an FMP, amendment, or regulations in response to overfishing,

*see id.* § 1854(e); and issue some stopgap measures to address emergencies or

overfishing, *see id.* § 1855(c).  Generally, the Secretary is obliged to implement

and enforce FMPs and regulations, as the MSA only authorizes the Secretary "to

carry out any fishery management plan or amendment approved . . . by him." *See*

*id.* § 1855(d).  The Secretary may only issue implementing regulations "as may be

necessary to discharge such responsibility." *Id.*  "All final regulations must be

consistent with the fishery management plan, with the national standards and other provisions of this [Act], and with any other applicable law." *Id.* § 1854(c)(7).

44. Proposed regulations for the implementation of a FMP are subject to the specific notice and comment requirements of the MSA. *Id.* § 1854(b)(1)(A), (c)(6)-(7).

45. The WPMFC governs fisheries in "the States of Hawaii, American Samoa, Guam, and the Northern Mariana Islands and [has] authority over the fisheries in the Pacific Ocean seaward of such States and the Commonwealths, territories, and possessions of the United States in the Pacific Ocean area." *Id.* § 1852.

46. The WPFMC's FEP was approved by the Secretary in 2002, and final rules were published on February 24, 2004. 69 Fed. Reg. 8,336. The FEP is the nation's first ecosystem-based plan for fisheries and includes specific measures to promote sustainable fisheries while providing for substantial protection of coral reef ecosystem resources and habitats.

47. Under the regulations implementing the FEP, anyone fishing for Hawaii Potentially Harvested Coral Reef Taxa, including for *Seriola rivoliana*, must attain a Special Coral Reef Ecosystem Permit. 50 C.F.R. § 665.224(a)(1) (2010). Special coral reef permits remain valid for one year after the date of issuance.

48. The WPFMC's FEP identifies aquaculture as one of seven *non-fishing*

activities that may adversely impact the ecosystem.

**B.   NEPA**

49. NEPA "promotes effort[s] which will prevent or eliminate damage to the environment," 42 U.S.C. § 4321 (2006), by requiring federal agencies to fully consider and disclose the environmental consequences of an agency action before proceeding with that action. *Id.* § 4332(2)(C); 40 C.F.R. §§ 1501.2, 1502.5 (2011).

50. NOAA guidelines require that major federal actions, such as the issuance of KBWF's disputed permit, shall undergo an environmental assessment ("EA"). NOAA, Environmental Review Procedures For Implementing The National Environmental Policy Act, Administrative Order Series 216-6 (May 20, 1999).

51. An EA is a "concise public document" for which a Federal agency is responsible that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact". 40 C.F.R. § 1508.9(a). In making this determination, an agency must take a "hard look" at potential environmental problems. An agency's evaluation of environmental consequences must be based on "accurate scientific analysis" of "high quality." *Id.* § 1500.1(b) (2011). The EA "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." *Id.* § 1508.9(b).

52. An EIS is required for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C) (2006); 40 C.F.R. § 1501.4 (2011). An EIS is required to be far more detailed than an EA. It must address "the environmental impact of the proposed action, alternatives to the proposed action, the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." 42 U.S.C. § 4332(C). An EIS's alternatives analysis is referred to as the "heart of the environmental impact statement." 40 C.F.R. § 1502.14 (2011). The document must "devote substantial treatment to each alternative." *Id.* § 1502.14(b).

53. Determinations of "significance" – that is, whether an EIS is to be issued and not simply an EA – is to be made based upon the context and intensity of the project. *Id.* § 1508.27. In terms of intensity, 40 C.F.R. § 1508.27(b) lists numerous factors for evaluation, including:

> (1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial;
> (2) The degree to which the proposed action affects public health or safety;
> (3) Unique characteristics of the geographic area such as proximity to; historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas;
> (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial;
> (5) The degree to which the possible effects on the human environment are

highly uncertain or involve unique or unknown risks;

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration;

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts;

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources;

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973;

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

54. An agency's preparation of EA, no matter how thorough, cannot

substitute for the preparation of an EIS if the agency's proposed action could

significantly affect environment. *Anderson v. Evans*, 371 F.3d 475 (9th Cir. 2004).

**C.     The APA**

55. The APA governs federal agency actions, including but not limited to

rulemaking.  The purpose for the APA is to improve the administration of justice

by prescribing fair administrative procedure.

56. Under the APA, a court is empowered to hold unlawful and set aside

agency action for findings and conclusions that, among other reasons, are

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law[,]. . . in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right[,] . . . and without observance of procedure required by law." 5 U.S.C. § 706(2) (2006).

57. With respect to informal rulemaking, the APA requires that agencies:  1) publish general notice of proposed rulemaking in the Federal Register no less than 30 days before the rule's effective date, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law; 2) allow interested persons an opportunity to participate in the rulemaking through public comment; and 3) after consideration of the comments presented, incorporate in the final rules a concise general statement of their basis and purpose. *Id.* § 553(b)-(d) .

58. Rulemaking is defined under the APA as "the agency process for formulating, amending, or repealing a rule." *Id.* § 551.  The act defines a rule as "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." *Id.* § 551(4).

## VI. CLAIMS FOR RELIEF

### CLAIM ONE

**Defendants Illegally Issued a Fishing Permit
in Violation of the MSA.**

59. Plaintiffs re-allege and incorporate by reference each and every

allegation set forth above in this Complaint.

60. Under the MSA, Defendants can only issue a fishing permit if authorized

to do so under a regional Fishery Management Plan. 16 U.S.C. § 1853(b)(1)(A)-

(C).

61. The WPFMC's FEP does not authorize the issuance of fishing permits

for aquaculture activities.

62. Indeed, the FEP expressly identifies aquaculture as one of seven *non-

fishing* activities, thus indicating that it did not authorize the Secretary to issue a

fishing permit for such activities.

63. Accordingly, Defendants lacks the statutory authority under the MSA to

issue a fishing permit for KBWF's aquaculture venture and they otherwise acted

outside their authority and arbitrarily and capriciously in issuing it. The permit and

all activities authorized under the permit are illegal under the MSA and should be

declared as such pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM TWO

### Defendants Illegally Engaged in De Facto Rulemaking Outside of Their Authority Under the MSA.

64. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above in this Complaint.

65. Defendants in this case issued a rule or regulations implementing WPFMC's FEP by prescribing, with future effect, law and policy by determining, for the first time ever, that aquaculture activities constitute "fishing" under the MSA.

66. Section 1855(d) of the MSA provides that the Secretary may only issue implementing regulations "as may be necessary to discharge . . . [the] responsibility" of carrying out an approved fishery management plan or amendment.  16 U.S.C. § 1855(d).

67. Defendants never made a finding that it was necessary to discharge its responsibilities under the FEP to issue a rule deeming aquaculture as fishing.

68. Therefore, Defendants violated 16 U.S.C. § 1855(d) and their rulemaking should be declared illegal pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM THREE

### Defendants Illegally Engaged in De Facto Rulemaking, Contrary to the FEP, in Violation of the MSA.

69. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above in this Complaint.

70. Under 16 U.S.C § 1854(c)(7), all final rules and regulations must be consistent with the FMP they implement.

71. Defendants' de facto rulemaking was inconsistent with the WPFMC's regional FMP.

72. Therefore, the permit and associated rulemaking violated 16 U.S.C. § 1854(c)(7) and should be declared illegal pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM FOUR

### Defendants Illegally Engaged in De Facto Rulemaking Without Following the MSA's Notice and Comment Requirements.

73. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above in this Complaint.

74. Proposed regulations for implementing a FMP must be published in the Federal Register for a public comment period of 15 to 60 days.  16 U.S.C. § 1854(b)(1)(A), (c)(6)-(7) (2006).

75. Defendants failed to have any public comment period on its de facto rulemaking and only issued its public comment period on the permit itself for 10 days.

76. Therefore, the permit and associated rulemaking violated 16 U.S.C. § 1854(b)(1)(A), (c)(6), and they should be declared illegal pursuant to the APA, 5 U.S.C. § 706(2)..

## CLAIM FIVE

### Defendants Failed to Adequately Assess the Environmental Impacts in Violation of NEPA.

77. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above in this Complaint.

78. NEPA requires federal agencies to fully consider and publicly disclose the environmental consequences of an agency action, such as the issuance of this permit, before proceeding with that action. 42 U.S.C. § 4332(C); 40 C.F.R. §§ 1501.2, 1502.5. The agency must provide, in its EA, sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI. 40 C.F.R. § 1508.9(a) (2011). In doing so, agencies must take a "hard look" at the potential environmental impacts of a proposed action. *Id.* § 1500.1(b).

79. In their determination not to issue an EIS for KBWF's permit, Defendants failed to, among other things, provide sufficient evidence and analysis of, and publicly disclose, potential environmental consequences of the project as well as examine and discuss unique, highly uncertain, and unknown risks of the novel commercial enterprise. For example, Defendants failed to adequately examine and discuss potential cultural impacts of the project, impacts to marine

mammals and other sea life and the potential damage that can be caused by runaway cages – a known, but only cursorily mentioned problem with the project.

80. Thus, Defendants failed to take a "hard look" at the environmental impacts of the proposed activity, thus violating NEPA, and the EA and FONSI should be declared illegal pursuant to the APA, 5 U.S.C. § 706(2).

## CLAIM SIX

### Defendants Engaged in De Facto Rulemaking in Violation of the APA.

81. Plaintiffs re-allege and incorporate by reference each and every allegation set forth above in this Complaint.

82. The APA defines rulemaking as "the agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551.  A rule is "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ." *Id.* § 551(4).

83. Under the APA agencies are required to:  1) publish general notice of proposed rulemaking in the Federal Register no less than 30 days before the rule's effective date, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law; 2) allow interested persons an opportunity to participate in the rulemaking through public comment; and 3) after consideration of the comments presented, incorporate in the

final rules adopted a concise general statement of their basis and purpose. *Id.* § 553(b)-(d).

84. Defendants in this case issued a rule – for the first time-ever, prescribing, with future effect, law and policy by defining aquaculture activities as fishing under the MSA. Defendant issued this rule without following the procedures required by the APA, including publishing a proposed rule in the Federal Register 30 days prior to its effective date, allowing public comment on it, considering the comments presented on, and incorporating a statement of its basis and purpose in the final rule.

85. Therefore, Defendants have engaged de facto rulemaking violating the APA.

## VII.  RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

  A. Declare that the Special Coral Reef Ecosystem Fishing Permit that Defendants issued to KBWF, and all activities described therein, are unlawful;

  B. Issue a permanent injunction ordering Defendants to suspend, rescind, or revoke KBWF's Special Coral Reef Ecosystem Fishing Permit, and prohibit any further cage activities authorized under it until Defendants comes into compliance with the MSA, NEPA, and the APA;

final rules adopted a concise general statement of their basis and purpose. *Id.* § 553(b)-(d).

84. Defendants in this case issued a rule – for the first time-ever, prescribing, with future effect, law and policy by defining aquaculture activities as fishing under the MSA.  Defendant issued this rule without following the procedures required by the APA, including publishing a proposed rule in the Federal Register 30 days prior to its effective date, allowing public comment on it, considering the comments presented on, and incorporating a statement of its basis and purpose in the final rule.

85. Therefore, Defendants have engaged de facto rulemaking violating the APA.

## VII.   RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Declare that the Special Coral Reef Ecosystem Fishing Permit that Defendants issued to KBWF, and all activities described therein, are unlawful;

B. Issue a permanent injunction ordering Defendants to suspend, rescind, or revoke KBWF's Special Coral Reef Ecosystem Fishing Permit, and prohibit any further cage activities authorized under it until Defendants comes into compliance with the MSA, NEPA, and the APA;

C.  Award Plaintiffs costs, including reasonable attorneys' fees pursuant to

authorities such as, but not limited to, the Equal Justice Act, 28 U.S.C. §

2812 (2006); and

D.  Award any other relief that the Court deems just and proper.

Respectfully submitted,

Dated: *August 1, 2011*

David Lawton (HI Bar No. 7338)
GALLAGHER & GALLAGHER
1925 Century Park East, Suite 950
Los Angeles, CA 90067
Telephone:  (310) 203-2600
Facsimile:  (310) 203-2610
E-mail: dlawton@thegallaghergroup.com

Attorney for Plaintiffs

28