IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KAHEA and FOOD & WATER WATCH, INC. | CIVIL NO. 11-00474 SOM-KSC |
| Plaintiffs, | ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| NATIONAL MARINE FISHERIES SERVICE; MICHAEL D. TOSATTO; in his official capacity as Regional Administrator of the National Marine Fisheries Service; ERIC C. SCHWAAB, in his official capacity as Assistant Administrator of the National Marine Fisheries Service; and GARY LOCKE, in his official capacity as Secretary of Commerce, | |
| Defendants. | |

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I.     INTRODUCTION.

          Plaintiffs KAHEA and Food and Water, Inc., seek to invalidate a one-year fishing permit issued by the National Marine Fisheries Service ("NMFS") to Kona Blue Water Farms, Inc., ("KBWF"). See Complaint for Injunctive and Declaratory Relief ¶ 1, Aug. 2, 2011, ECF No. 1. The permit authorizes KBWF to "stock, culture and harvest" almaco jack fish using "CuPod gear" in federal waters off the coast of the Big Island. Administrative Record ("AR") at 90. The "CuPod" is a brass-link mesh cage that, instead of being tethered to land or anything

stationary, is instead continuously towed behind a vessel, remaining submerged at a predetermined depth during normal operations. AR at 17, 19. The permit in issue authorized KBWF to hold up to 2,000 almaco jack at one time in the CuPod, where they were expected to grow. AR at 91. Plaintiffs describe the KBWF project as a fish farm and characterize its operations as "aquaculture." See Compl. ¶ 1, 5.

Defendants issued KBWF a Special Coral Reef Ecosystem Fishing Permit, see 50 C.F.R. § 665.224, pursuant to its regulating authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884. Plaintiffs argue that, although Defendants may properly issue such permits authorizing "fishing," KBWF's project invovles aquaculture, which is not fishing under the MSA. Plaintiffs also argue that, by issuing KBWF a fishing permit, Defendants made a de facto rule that aquaculture is fishing under the MSA, in violation of the MSA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, 701-706. Finally, Plaintiffs assert that Defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321-4347, by failing to prepare an Environmental Impact Statement.

Plaintiffs and Defendants have filed cross-motions for summary judgment. The court denies Plaintiffs' motion and grants Defendants' motion.

II.    STATUTORY FRAMEWORKS.

    A.    The MSA.

    The MSA, 16 U.S.C. §§ 1801 to 1883, was enacted, among
other reasons, "to conserve and manage the fishery resources
found off the coasts of the United States" and, in particular,
within the United States' exclusive economic zone.  16 U.S.C. §
1801(b)(1).  See generally Sea Hawk Seafood, Inc., v. Locke, 568
F.3d 757 (9th Cir. 2009); Or. Trollers Ass'n v. Gutierrez, 452
F.3d 1104, 1108 (9th Cir. 2006).  The MSA provides for the
establishment of eight Regional Fishery Management Councils,
16 U.S.C. § 1852(a), each made up of "individuals who, by reason
of their occupational or other experience, scientific expertise,
or training, are knowledgeable regarding conservation and
management, or the commercial or recreational harvest, of the
fishery resources of the geographical area concerned."  Id.
§ 1852(b)(2)(A).  The Western Pacific Regional Council (the
"Council") oversees Hawaii.  Id. § 1852(a)(1)(H)

    Each Regional Council is required to prepare and submit
to the Secretary of Commerce a fishery management plan ("FMP"),
as well as any amendments to the FMP as "are necessary from time
to time."  Id. § 1852(h)(1).  An FMP should contain various
information with respect to any fishery, including conservation
and management measures to be undertaken; a description of the
fishery, including the number of vessels to be allowed in the

fishery and the type and quantity of fishing gear to be used; and the identification of essential fish habitats. Id. § 1853(a)(1)-(15). An FMP may require any fishing vessel to obatin a permit authorizing its operation. Id. § 1853(b)(1). The FMP applicable to Hawaii is the Hawaii Archipelagic Fishery Ecosystem Plan. See Administrative Record ("AR") at 2659-2944.

Congress delegated to the Secretary of Commerce the overall authority to implement the MSA. The Secretary acts through the NMFS and the National Oceanic Atmospheric Administration. Sea Hawk, 568 F.3d at 759. The Secretary is also vested with the authority to approve, reject, or partially approve an FMP and any amendments the FMP. 16 U.S.C. § 1854(a)(1)(B).

B. NEPA.

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Congress enacted NEPA to ensure that all federal agencies would factor environmental considerations into decisionmaking. To achieve this goal, NEPA requires a federal agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). "NEPA ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be

made available to the larger [public] audience." <u>Blue Mountains</u> <u>Biodiversity Project v. Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998).

If, as here, an agency's regulations do not categorically require or exclude the preparation of an EIS, the agency must first prepare an Environmental Assessment ("EA") to determine whether the action will have a significant effect on the environment. 40 C.F.R. § 1501.4. An EA is less comprehensive and less detailed than an EIS. <u>See</u> <u>Conner v.</u> <u>Burford</u>, 848 F.2d 1441, 1446 (9th Cir. 1988); 40 C.F.R. § 1508.9. It is a document that: (1) provides sufficient evidence and analysis for determining whether to prepare an EIS or to issue a Finding of No Significant Impact ("FONSI"); (2) aids in an agency's compliance with NEPA when no EIS is necessary; and (3) facilitates preparation of an EIS when one is necessary. <u>See</u> 40 C.F.R. § 1508.9(a). If the EA establishes that the agency's action "may have a significant effect upon the . . . environment, an EIS must be prepared." <u>Found. for N. Am. Wild Sheep v. United</u> <u>States Dep't of Agric.</u>, 681 F.2d 1172, 1178 (9th Cir. 1982). If the EA indicates that the agency's action will not significantly affect the quality of the human environment, the agency must issue a FONSI. <u>See</u> <u>Blue Mountains</u>, 161 F.3d at 1212.

III.     FACTUAL BACKGROUND.

KBWF applied for and was granted a Special Coral Reef Ecosystem Fishing Permit ("SCREFP") by the NMFS that authorized KBWF to "demonstrate" the "Velella Concept" in federal waters. AR at 90.  The Velella Concept cultures 2,000 almaco jack inside a CuPod, which is a 132-cubic-meter cage.  AR at 19-20.

The fish cultured in the CuPod were to be obtained from KBWF's land-based hatchery and taken to the CuPod.  AR at 19-20. Once at the project site, which was three nautical miles off-shore, the CuPod was to be towed behind a sailing vessel in deep waters (between 10,000 to 20,000 feet).  The CuPod was to be constantly moving.  AR at 20.  Upon completing their growth cycle inside the CuPod, the fish were to be removed and taken to land. AR at 26.

KBWF submitted its permit application on November 5, 2010.  The NMFS proposed the issuance of a limited, one-year permit so that KBWF could demonstrate the Velella Concept.  See AR at 19.  As part of its review process, the NMFS prepared a draft EA.  AR at 4450.  After receiving public comment and approval by the Council, the NMFS submitted its final EA.  Based on the EA, the NMFS determined that the KBWF project would not have a significant impact on the quality of the human environment and issued a FONSI.  See AR at 10.  On July 6, 2011, the SCREFP

was issued.  See AR at 90.  The permit was to expire on July 8, 2012.  Id.

Plaintiffs brought this action on August, 2, 2011, challenging the issuance of the permit under the MSA, NEPA, and the APA.  They assert that the NFMS lacked the authority to issue the permit under the MSA (Claim One); that Defendants engaged in de facto rulemaking in violation of the MSA and the APA (Claims Two, Three, Four, and Six); and that Defendants violated NEPA by failing to prepare an EIS (Claim Five).  The Complaint seeks a court order declaring that the permit in issue is unlawful, requiring Defendants to "suspend, rescind, or revoke" the permit, and enjoining any further activity authorized by the permit.

On February 9, 2012, after the parties had filed competing summary judgment motions, KBWF completed its project.  See Defs.' Ex. C, ECF No. 38-1.  KBWF removed and dismantled the CuPod.  Id.  Defendants say that no additional operations are scheduled to be conducted under the permit.  Id. at Decl. of Alvin Katekaru ¶ 2.  After being questioned by the court at the hearing on these motions about whether KBWF, or any other company, could resume operations under the existing permit, the NMFS terminated the permit.  Decl. of Michael D. Tosatto, ¶ 2, Attachment A, ECF No. 44.

IV.      LEGAL STANDARD.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court "the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. Catrett, 477 U.S. 317, 323 (1986)); accord Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006). "A fact is material if it could affect the outcome of the suit under the governing substantive law." Miller, 454 F.3d at 987. When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were uncontroverted at trial. Id. (quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Rest., Inc., 213 F.3d 474, 480 (9th Cir. 2000)). When the nonmoving party bears the burden of proof on

8

one or more issues at trial, the party moving for summary judgment may satisfy its burden with respect to those issues by pointing out to the court an absence of evidence from the nonmoving party.  <u>Miller</u>, 454 F.3d at 987.

When the moving party meets its initial burden on a summary judgment motion, "[t]he burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial."  <u>Id.</u>  The court must not weigh the evidence or determine the truth of a matter; it should only determine whether there is a genuine issue for trial.  <u>See</u> <u>Balint v. Carson City, Nev.</u>, 180 F.3d 1047, 1054 (9th Cir. 1999).  On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor."  <u>Miller</u>, 454 F.3d at 988 (brackets omitted) (quoting <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999)).

Summary judgment may also be appropriate when a mixed question of fact and law involves undisputed underlying facts.  <u>See</u> <u>EEOC v. UPS</u>, 424 F.3d 1060, 1068 (9th Cir. 2005); <u>Colacurcio v. City of Kent</u>, 163 F.3d 545, 549 (9th Cir. 1998).

V.       <u>ANALYSIS.</u>

      A.    <u>Mootness.</u>

          1.    <u>NEPA Claim.</u>

Defendants argue that Plaintiffs' NEPA claim (Claim Five) is moot because KBWF has completed its project.  Issues of

mootness can affect the justiciability of an action after a suit is filed. See Hill v. Blind Indus. & Servs. of Maryland, 179 F.3d 754, 757 (9th Cir. 1999) ("Mootness is grounds to dismiss an action at any time, because there is no longer a case or controversy for purposes of Article III"). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Cnty. of L.A. v. Davis, 440 U.S. 625, 631 (1979) (quoting Powell v. McCormack, 395 U.S. 486, 496 (1969)). As the issue of mootness goes to the court's subject matter jurisdiction, it is typically addressed in a motion brought pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Here, the mootness issue is affected by events occurring even after the present motions were filed.

Addressing whether a NEPA claim was moot, the Ninth Circuit has stated, "Where an activity sought to be enjoined has already occurred, a court cannot undo what has already been done." Friends of the Earth v. Bergland, 576 F.2d 1377, 1379 (9th Cir. 1978) (citing In re Combined Metals Reduction Co., 557 F.2d 179 (9th Cir. 1977)). However, "[t]he burden of demonstrating mootness is a heavy one." Feldman v. Bomar, 518 F.3d 637, 642 (9th Cir. 2008) (quoting Nw. Envtl. Def. Ctr. v. Gordon ("Gordon"), 849 F.2d 1241, 1244 (9th Cir. 1988)). Defendants argue that, with respect to Plaintiffs' NEPA claim, no

live controversy now exists because KBWF has stopped operating the CuPod.  They argue that this court cannot provide the relief requested by Plaintiffs (prohibiting further action under the permit) because no action is being taken under the permit and no further action will be taken.  After the hearing on these motions, the NMFS terminated the permit in issue.  The court agrees with Defendants that Plaintiffs' NEPA claim is moot.

In determining whether a request for an injunction is moot, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available."  Or. Natural Res. Council v. U.S. Bureau of Land Management, 470 F.3d 818, 820-21 (9th Cir. 2006) (citations omitted).  Rather, "[t]he question is whether there can be any effective relief."  Id. (quoting Gordon, 849 F.2d at 1244-45 (9th Cir. 1988)).  Because the KBWF project is complete and the permit has been terminated, the court cannot provide Plaintiffs with any effective relief relevant to their NEPA claim.

In Feldman, 518 F.3d at 640, the Ninth Circuit held that a NEPA claim was moot when the action the plaintiffs sought to enjoin had already been completed, the plaintiffs alleged only procedural violations, and the plaintiffs were not seeking monetary compensation.  In issue was a program implemented by the National Park Service ("NPS") to eradicate the feral pig population of Santa Cruz Island.  Id.  The plaintiffs did not

dispute that eradication was appropriate given the pigs' adverse
effect on the island's ecological and archeological
infrastructure, but they sought nonlethal methods of addressing
the problem, such as sterilization of the pigs or removal of the
pigs from the island.  Id.  Asserting claims under NEPA and the
California Environmental Quality Act, the plaintiffs challenged
the process by which the NPS had determined that the pigs should
be killed, including its alleged failure to consider reasonable
alternatives and to analyze the cumulative effects of pig
eradication in the EIS that had been prepared for the project.
Id. at 641.

        The district court granted summary judgment to the NPS.
Id.  The plaintiffs appealed, but, while their appeal was
pending, the remaining pigs were killed.  Id.  The Ninth Circuit
dismissed the case on mootness grounds, concluding that no
effective relief was available for the alleged procedural
violations in issue.  Id. at 643.  The court stated:

                Appellants have never contested that the
                presence of feral pigs on Santa Cruz Island
                endangered important archeological and
                ecological resources; rather, they simply
                desired an alternative means of resolving the
                problem.  Now that the pigs have been killed,
                Appellants have suffered whatever harm could
                conceivably result from the challenged agency
                action. . . .  Because we cannot resurrect
                the pigs, nor retroactively remedy any pain
                that they might have felt from being shot,
                nor take any other action to prevent or undo
                the eradication at issue here, we lack the
                power to grant any effective relief.

Id. (citations omitted).

The Ninth Circuit distinguished Feldman from previous cases that had remained "live" even after the contested projects had been completed.  In those cases, the Ninth Circuit noted, the challenged activity caused continuing harm, so a court could still provide relief by limiting future adverse effects of the challenged act.  Id. at 642 (citing Or. Natural Res. Council, 470 F.3d at 821 (finding that an appropriate EA could lead to effective post-harvest relief even though a challenged timber-harvesting project had been completed); Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1065–66 (9th Cir. 2002) ("If warranted, [the district court] might order the Forest Service to adjust future timber plans to compensate for this allegedly unlawful one."); Cantrell v. City of Long Beach, 241 F.3d 674, 678–79 (9th Cir. 2001) (effects of destruction of historic buildings and trees could still be mitigated); Tyler v. Cuomo, 236 F.3d 1124, 1137 (9th Cir. 2000) (a challenge to a housing project that had already been built could still result in certain modifications); West v. Sec'y of the Dep't of Transp., 206 F.3d 920, 925 (9th Cir. 2000) (construction of a highway that was already in use could still be challenged because the highway could be ordered closed or taken down); Pyramid Lake Paiute Tribe of Indians v. Hodel, 882 F.2d 364, 368 (9th Cir. 1989) (a challenge to a completed governmental action affecting fish could

still lead to protection in future spawning seasons); Gordon, 849
F.2d at 1245 (same); and Columbia Basin Land Prot. Ass'n v.
Schlesinger, 643 F.2d 585, 591 n. 1 (9th Cir. 1981) (although a
power line had been constructed, the matter was not moot because
the line could still be removed)).

The plaintiffs in Feldman argued that, as in cases the
Ninth Circuit cited as involving continuing harm that could still
be remedied, relief could indeed still be ordered in their case.
Unpersuaded, the Ninth Circuit noted that the particular cases
Feldman sought to analogize its situation to had involved
challenges to actions that, apart from their primary import, also
had secondary effects that could be remedied even after the
primary harm had occurred.  518 F.3d at 643.  Thus, Neighbors of
Cuddy Mountain, 303 F.3d at 1066, pointed to by the plaintiffs in
Feldman, had involved a challenge to sales of timber that the
plaintiffs in that case had challenged.  Even after the sales had
occurred and the trees that had been removed for logs could not
be reinstated, the Ninth Circuit noted that a court could order
the defendants to mitigate resulting damage to, for example, bird
species that had been displaced when the trees were removed.

Similarly, in Gordon, the Ninth Circuit had reversed the
district court's ruling that a matter was moot.  The plaintiffs
in Gordon had challenged salmon fishing regulations applicable to
the 1986 fishing season.  Even though the season had ended and

fish harvested in 1986 under those regulations could not be resurrected, the court said that damage caused by the 1986 regulations could be mitigated by allowing more fish to spawn in 1989. 849 F.2d at 1245.

The plaintiffs in <u>Cantrell</u> challenged as insufficient an EIS relating to the development of a site that had been a naval station. Even after historic buildings and trees had been taken down, the challenge was not moot, because the secondary damage could still be mitigated. The defendants could, for instance, have been ordered to complete additional environmental review, or to create new habitats for birds that had previously nested or foraged in the affected areas. 241 F.3d at 678-79.

<u>Feldman</u> did not involve analogous secondary harm that could be remedied. Once the pigs were killed, relief was unavailable.

The present case is analogous to <u>Feldman</u> in that Plaintiffs do not allege any continuing harm resulting from the issuance of the permit. They identify no secondary harm that can be mitigated by now requiring Defendants to prepare an EIS. Although Plaintiffs point to potential environmental impacts that were raised in comments to the draft EA, such as "potential cultural impacts [and] impacts to marine mammals and other sea life," Compl. ¶ 79, they identify no actual harm resulting from the KBWF project. At this point, Plaintiffs are only

15

speculating. Nor do Plaintiffs suggest any mitigating measures
that the court might take. Plaintiffs seek to invalidate the
permit because the NMFS allegedly failed to comply with various
statutes in issuing the permit, not because KBWF's project has
harmed or will harm the environment in any definable or
discernible way. Now that the permit has been terminated, there
is no effective relief this court can order for an alleged NEPA
violation. The only harm alleged is what Plaintiffs claim is the
NFMS's foray outside its authority and alleged flouting of NEPA
procedures. See Or. Natural Resources Council, 470 F.3d at 825
(Tashima, J., dissenting) ("It is important to remember that NEPA
is only a procedural statute, *i.e.*, it 'imposes procedural
requirements, but not substantive outcomes, on agency action.'"
(quoting Lands Council v. U.S. Forest Serv., 395 F.3d 1019, 1026
(9th Cir. 2004)).

The present case does not involve issues such as those
raised in Center for Food Safety v. Veneman, 364 F. Supp. 2d
1202, 1213 (D. Haw. 2005). In that case, a judge in this
district found a NEPA claim not moot even though the permits in
issue authorizing field tests of genetically engineered crops had
expired. Judge Ezra ruled that effective relief was still
available because he could order the defendants to study the
impact of the testing and could require remedial measures. Id.
The plaintiffs in that case were seeking declaratory and

injective relief in connection with the alleged risks posed by the field tests to public health, the environment, and the economy. <u>Id.</u> at 1206.

By contrast, Plaintiffs in this case seek only a declaration that the permit is unlawful and an injunction suspending, rescinding, or revoking the permit. Compl. at 27-28. The court recognizes that the Complaint also seeks "other relief that the Court deems just and proper," which may permit the court to fashion alternative relief. <u>See</u> <u>Neighbors of Cuddy Mountain</u>, 303 F.3d at 1066 (holding that a court could provide effective relief in the form of relief that had not been expressly requested because the complaint requested "such further relief as may be necessary and appropriate to avoid further irreparable harm"). But the court does not see, and Plaintiffs have not identified, any relief that could now be ordered to remedy the alleged NEPA violation. Plaintiffs point to no continuing harm or harm that can be mitigated. Claim Five is thus moot.

2. <u>MSA and APA Claims.</u>

Given Defendants' assertion that KBWF no longer operates pursuant to the permit, the court asked the parties to submit supplemental briefing regarding the justiciability of Plaintiffs' MSA and APA claims. The court agrees with the parties that those claims are not moot.

Plaintiffs' MSA claim is not moot because it is
"capable of repetition yet evading review."  KBWF has told
Defendants that it intends to seek another permit, and the NMFS
is requiring KBWF to submit a new SCREFP application to get a
future permit.  See Fed. Defs.' Supp. Brief on Mootness, at 2,
Mar. 19, 2012, ECF No. 40.

With respect to the APA claim, Plaintiffs assert that
Defendants made a de facto rule that aquaculture constitutes a
form of fishing under the MSA.  This claim is not moot because,
assuming Defendants did in fact make a rule, a challenge to the
rule's validity is live so long as the rule remains in effect.

In connection with finding a matter "capable of
repetition yet evading review," the court must begin with
examining whether the injury suffered is "of a type inherently
limited in duration such that it is likely always to become moot
before federal court litigation is completed."  Ctr. For
Biological Diversity v. Lohn, 511 F.3d 960, 965 (9th Cir. 2007)
(citing Native Vill. of Noatak v. Blatchford, 38 F.3d 1505,
1509-10 (9th Cir. 1994)).  "[A]n issue that 'evades review' is
one which, in its regular course, resolves itself without
allowing sufficient time for appellate review."  Biodiversity
Legal Found. v. Badgley, 309 F.3d 1166, 1173-74 (9th Cir. 2002).

The Ninth Circuit has held that regulations in effect
for one year do not last long enough for judicial review.  Alaska

<u>Ctr. for the Env't v. U.S. Forest Serv.</u>, 189 F.3d 851, 855 (9th Cir. 1999); <u>Greenpeace Action v. Franklin</u>, 14 F.3d 1324, 1329-30 (9th Cir. 1993). According to Defendants, if a new KBWF application is approved, KBWF will be issued another one-year permit. Any challenge to the proposed permit will become ripe only when the permit is actually issued. <u>See</u> <u>Malama Makua v. Rumsfeld</u>, 136 F. Supp. 2d 1155, 1161-62 (D. Haw. 2001) (explaining that the APA authorizes judicial review of agency action only when such action is final) (citing <u>Bennet v. Spear</u>, 520 U.S. 154, 177-78 (1997)). A new KBWF one-year permit therefore will evade review if deemed moot upon expiration.

Plaintiffs can, of course, seek a preliminary injunction barring activity permitted under any newly issued permit, and an injunction might issue before the passage of a year. This, however, does not take Plaintiffs' claim out of the "evading review" category. Even if KBWF's activities are enjoined, the permit will expire before judicial review can be completed, putting Plaintiffs in the position they are in now. <u>See</u> <u>Greenpeace Action</u>, 14 F.3d at 1330 (explaining that "[n]o injunction could have preserved this challenge to a short-term [regulation]" because "[a]lthough the [activity in issue] could have been enjoined, the expiration of the [regulation] could not").

The second "capable of repetition yet evading review"
requirement calls for "a reasonable expectation that the
plaintiff will be subjected to the same action again." C.F. ex
rel. Farnan v. Capistrano Unified Sch. Dist., 654 F.3d 975, 983
(9th Cir. 2011) (quoting Doe v. Madison Sch. Dist. No. 321, 177
F.3d 789, 798 (9th Cir. 1999) (en banc))).  This requirement is
met here, as the NMFS's decision to issue KBWF another permit
will again depend on a determination that KBWF's activities
constitute fishing under the MSA.

    B.    MSA Claim.

    Having determined that certain claims are not moot, the
court turns to the merits of the "live" claims.  Plaintiffs argue
that Defendants' issuance of the permit in issue was outside the
authority conferred by law.  The MSA authorizes the NMFS to issue
a SCREFP for fishing, but, Plaintiffs say, KBWF is engaging in
"aquaculture," not "fishing" as defined by the MSA.  The court
disagrees.

    The Administrative Procedure Act governs judicial
review of agency decisions under the MSA.  Alaska Trojan
Partnership v. Guitierrez, 425 F.3d 620, 627 (9th Cir. 2005).
This court may set aside Defendants' administrative decision
"only if it is arbitrary and capricious, an abuse of discretion,
or otherwise not in accordance with the law."  See id. (citing
5 U.S.C. § 706(2)(A), and Wards Cove Packing Co. v. NMFS, 307

F.3d 1214, 1218 (9th Cir. 2002)).  Review under the arbitrary and
capricious standard must be "narrow," but "searching and
careful."  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378
(1989).  The court considers whether there is a rational
connection between the facts found and the choices made by the
agency, and whether the agency committed a clear error of
judgment.  See Or. Natural Res. Council v. Allen, 476 F.3d 1031,
1036 (9th Cir. 2007).  This court must reject a construction of a
statute that is "'contrary to clear congressional intent or that
frustrate[s] the policy that Congress sought to implement.'" Coyt
v. Holder, 593 F.3d 902, 905-06 (9th Cir. 2010) (quoting
Schneider v. Chertoff, 450 F.3d 944, 952 (9th Cir. 2006)); see
also Mercado-Zazueta v. Holder, 580 F.3d 1102, 1106 (9th Cir.
2009).  A court may not, however, substitute its own judgment for
that of the agency, or merely determine that it would have
decided an issue differently.  Marsh, 490 U.S. at 377.

Plaintiffs do not demonstrate that Defendants' issuance
of KBWF's permit was "arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with the law."
5 U.S.C. § 706(2)(A).  The NMFS issued the permit pursuant to
50 C.F.R. § 665.224, which expressly applies to Hawaii coral reef
ecosystem permits:

> Any person of the United States fishing for,
> taking or retaining Hawaii coral reef
> ecosystem [management unit species ("MUS")]
> must have a special permit if they, or a

21

vessel which they operate, is used to fish
for any . . . [MUS].

As stated above, the question in this case is whether
Defendants properly concluded that what KBWF proposed to do was
"fishing," as defined by the MSA.  The MSA defines "fishing"
broadly:

> The term "fishing" means--
>     (A) the catching, taking, or harvesting
> of fish;
>     (B) the attempted catching, taking, or
> harvesting of fish;
>     (C) any other activity which can
> reasonably be expected to result in the
> catching, taking, or harvesting of fish; or
>     (D) any operations at sea in support of,
> or in preparation for, any activity described
> in subparagraphs (A) through (C).

16 U.S.C. § 1802.  The NMFS determined that KBWF's project fell
within this definition.  In particular, the NMFS concluded that
the project involved the "harvesting of fish."

The Ninth Circuit has held that the "interpretation of
statutes and regulations by an agency charged with their
administration is entitled to due deference and should be
accepted unless demonstrably irrational or clearly contrary to
the plain meaning."  <u>Adams v. Bowen</u>, 872 F.2d 926, 926 (9th Cir.
1989) (quoting <u>Nevitt v. United States</u>, 828 F.2d 1405, 1406-07
(9th Cir. 1987)).  Defendants' interpretation of the word
"harvesting" was not irrational or contrary to plain meaning.
The MSA does not define "harvesting," nor is there a regulation

defining the term.  The court is unaware of any legislative
history discussing the definition of "fishing" or the meaning of
"harvesting" in the MSA.  The court is also unaware of a
definition of "aquaculture" in the MSA.

Defendants look to the dictionary definition of
"harvest" as "the act or process of gathering in a crop."  See
Memo in Supp. of Fed. Defs.' Cross-Motion for Summ. J. 11, Feb.
7, 2012, ECF No. 32-1 (quoting Harvest Definition, MERRIAM-WEBSTER,
http://www.merriam-webster.com/dictionary/harvest (last visited
Apr. 27, 2012)).  "Crop," says Defendants, is defined as "a plant
or animal . . . that can be grown and harvested extensively for
profit or subsistence."  Id. (quoting Crop Definition, MERRIAM-
WEBSTER, http://www.merriam-webster.com/dictionary/crop (last
visited Apr. 27, 2012)).  Defendants' determination that KBWF's
project falls within the term "harvesting" was reasonable.  The
project involves growing and gathering a "crop" of almaco jack to
sell for human consumption.

Defendants also contend that construing KBWF's project
as "fishing" does not contravene congressional intent, even
though the project does not involve traditional fishing, as in
the casting of a line.  They point out that the definition of
"fishing" in the MSA also includes "any operations at sea in
support of, or in preparation for" fishing.  16 U.S.C.
§ 1802(16)(D); see Duckworth v. United States, 705 F. Supp. 2d

30, 45-48 (D.D.C. 2010) (ruling that the laying of lobster traps without bait is "fishing" under the MSA).

The court is not persuaded by Plaintiffs' argument that the Western Pacific Regional Council's definition of "harvest" in the FMP is controlling here. According to Plaintiffs, because Congress did not define "harvesting" in the MSA, the authority to define the term was delegated to the Regional Fishery Councils. The Council, in the FMP, has defined "harvest" as "the catching or taking of a marine organism or fishery MUS by any means." AR at 2676. Plaintiffs argue that characterizing KBWF's project as "harvesting" contradicts the definition of "harvest" in the FMP, as it involves neither the catching nor taking of fish.

Adopting the definition of "harvest" in the FMP--"the catching and taking of fish"--would render the word "harvesting" in the MSA superfluous. That is, the MSA's definition of "fishing" as "the catching, taking, or harvesting of fish" would be equivalent to "the catching, taking, or the catching and taking of fish." This court is required to "interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." United States v. Cabaccang, 332 F.3d 622, 627 (9th Cir. 2003) (en banc) (quoting Boise Cascade Corp. v. EPA, 942 F.2d 1427, 1432 (9th Cir. 1991)). The definition of "harvest" in

the FMP completely destroys any purpose for inclusion of the word "harvesting" in the MSA.

The court recognizes that statutes may define terms by listing words that are redundant, share similar definitions, or are not mutually exclusive. For example, the MSA defines a "fishing vessel" as "any vessel, boat, ship, or other craft which is normally used for, or of a type which is normally used for (A) fishing." 16 U.S.C. § 1802(18). It is difficult to see the distinction between a "boat" and a "craft," and arguably the terms are repetitious. The court is not, however, saying that a list of similar words is necessarily problematic. Rather, the court is concerned that Plaintiffs are arguing that the MSA must be read as repeating the very same words within the definition of "fishing." The equivalent in the definition of "fishing vessel" would be any "vessel, boat, or boat." In such a definition, the second "boat" would be ignored as superfluous. That is, the second "boat" would essentially be deleted from the definition. Yet, at the hearing on the present motions, even while arguing that the Council has the authority to narrow a statutory definition, Plaintiffs conceded that it would be "problematic" if an FMP deleted a word from a statutory definition. Transcript of Proceedings, April 2, 2012, at 10:9 - 11:19.

Nor is this court persuaded by Plaintiffs that Defendants are bound by the Council's statement in the FMP that

aquaculture is a "non-fishing activity." AR at 2883. Plaintiffs take that statement out of context. The FMP refers to aquaculture in a section addressing impacts that may adversely affect a fish habitat. Id. Defendants contend that the Council did not intend to define "aquaculture," as it is not defined in the definitions section of the FMP. Nor, according to Defendants, did the Council seek to affect whether or how "aquaculture" could be regulated. There is no indication that the Council intended to say that everything listed as "non-fishing" in that section was categorically outside the MSA's broad definition of "fishing." Absent something indicating such an intent, the court does not read the FMP in that expansive manner.

The bottom line is that the NMFS' characterization of the KBWF project as "fishing" was not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Accordingly, the court defers to the NMFS. Summary judgment is warranted in favor of Defendants with respect to Claim One.

C.    De Facto Rulemaking.

Claims Two, Three, Four, and Six assert that Defendants promulgated a de facto rule when they issued the SCREFP in issue. The APA defines a rule as:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . .

The most common example of "rules" issued under the APA are regulations promulgated by agencies.  See <u>Am. Oceans Campaign v. Daley</u>, 183 F. Supp. 2d 1, 10-11 (D.D.C. 2000) ("Under the APA, the terms "rule" and "regulation" are used interchangeably."). Plaintiffs argue that, by construing KBWF's activities as "fishing," Defendants set forth a rule that aquaculture is "fishing" for purposes of the MSA.  The court disagrees.

Distinguishing between agency action that results in adjudication and agency action that results in a rule, the Ninth Circuit has stated that "rulemaking affects the rights of broad classes of unspecified individuals." <u>Yesler Terrace Cmty. Council v. Cisneros</u>, 37 F.3d 442, 448 (9th Cir. 1994); <u>see also</u> <u>MacLean v. Dep't of Homeland Sec.</u>, 543 F.3d 1145 (9th Cir. 2008) ("An agency adjudication may require a notice and comment period if it constitutes de facto rulemaking that 'affects the rights of broad classes of unspecified individuals.'" (quoting <u>Yesler Terrace Cmty</u>, 37 F.3d at 448)).

The permit issued to KBWF did not create a rule that aquaculture is "fishing."  The NMFS issued one permit authorizing a specific project to "stock, culture, and harvest" almaco jack using the CuPod in a designated area.  AR at 90.  The permit does not expressly authorize "aquaculture."  Even if KBWF's activities do constitute aquaculture, the issuance of the permit does not mean that every application the NMFS receives requesting a permit

to conduct aquaculture will be granted so long as the application
meets other permitting requirements.  If the NMFS receives a
SCREFP application seeking to conduct aquaculture, the NMFS will
have to look at the specific activities proposed and determine
whether those actions involve "the catching, taking, or
harvesting of fish."  16 U.S.C. § 1802(16).  Calling an activity
"aquaculture" will not be enough.

Plaintiffs' analogy to American Oceans Campaign v.
Daley, 183 F. Supp. 2d at 10-11, is unpersuasive.  In American
Oceans, the plaintiffs challenged amendments to an FMP.  The
United States District Court for the District of Columbia treated
the amendments like regulations in part because they applied
generally to many fisheries and had future effect.  Id. at 11.
The single-use permit issued in this case is not akin to such
amendments, which apply to all individuals and organizations
within an FMP's geographic area.  There is no indication that
KBWF's permit applies to any other fishery or that it has any
future effect.  Summary judgment is therefore warranted in favor
of Defendants with respect to Claims Two, Three, Four, and Six.

VI.     CONCLUSION.

Defendants' summary judgment motion is granted, and
Plaintiffs' summary judgment motion is denied.  The Clerk of

Court is directed to enter judgment in favor of Defendants and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 27, 2012.



 /s/ Susan Oki Mollway 
Susan Oki Mollway
Chief United States District Judge

KAHEA et al. v. National Marine Fisheries Service, et al.; Civil No. 11-00474 SOM/KSC; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT.