1  David Lawton (HI Bar No. 7338)
   THE GALLAGHER LAW GROUP PC
2  1875 Century Park East, Suite 1550
   Los Angeles, CA 90067
3  Telephone:  (310) 203-2600
4  Facsimile:  (310) 203-2610
   E-mail: dlawton@thegallaghergroup.com
5
6  Attorney for Plaintiffs

7             **UNITED STATES DISTRICT COURT**
8
9            **FOR THE DISTRICT OF HAWAII**

10

11  KAHEA and
12  FOOD & WATER WATCH, INC.,          Case No. CV-11-00474 SOM KSC

13                 Plaintiffs,

14      v.                             PLAINTIFF'S NOTICE OF
                                       MOTION AND MOTION FOR
15                                     LEAVE TO FILE RENEWED
                                       MOTION FOR SUMMARY
16  NATIONAL MARINE FISHERIES          JUDGMENT; MEMORANDUM
    SERVICE; MICHAEL D. TOSATTO,       OF POINTS AND AUTHORITIES
17  Regional Administrator of the National   IN SUPPORT THEREOF
    Marine Fisheries Service, Pacific Islands
18  Regional Office; SAMUEL D. RAUCH   Judge:  Hon. Susan Oki Mollway
    III, Assistant Administrator of the
19  National Marine Fisheries Service; and
20  PENNY PRITZKER, Secretary of
    Commerce,
21
22
23                 Defendants.

24

25

26

27

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that Plaintiff FOOD & WATER WATCH, INC., will and hereby does move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for leave to file a motion for an order granting summary judgment as to its National Environmental Policy Act claim in its Complaint For Injunctive and Declaratory Relief filed on August 2, 2011.  This Motion is supported by the following Memorandum of Points and Authorities, the proposed Renewed Motion for Summary Judgment, its corresponding Memorandum of Points and Authorities (Ex. F), and exhibits and declarations supporting both motions.

DATED: February 27, 2014

Respectfully submitted,

THE GALLAGHER LAW GROUP PC

David H. Lawton
Attorneys for Plaintiff

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# **TABLE OF CONTENTS**

I.      Introduction...................................................................................................1

II.     Background and Procedural Posture................................................................1

III.    Argument .......................................................................................................6

        A.      A Renewed Summary Judgment Motion Is Proper. ............................6

        B.      Supplemental Briefing on Summary Judgment Is Necessary To
                Address the NEPA Issues for Which There Remains Ongoing And
                Repeatable Harms................................................................................7

        C.      Supplemental Briefing on Summary Judgment Is Necessary Because
                of the Expanded Factual Record From the Velella II's Approval. .....10

IV.    Conclusion......................................................................................................16

1

2

# TABLE OF AUTHORITIES

3

4

## CASES

5  Airport Cmtys. Coal. v. Graves, 280 F. Supp. 2d 1207 (W.D. Wash. 2003)..............................12

6  Am. Army Servs. Corp. v. United States, 106 Fed. Cl. 714 (2012)............................................12

7  Association of Pacific Fisheries v. EPA, 615 F.2d 794 (9th Cir. 1980) ......................................12

8  Capitol Industries-EMI, Inc. v. Bennett, 681 F.2d 1107 (9th Cir. 1982)......................................6

9  Ctr. for Biological Diversity v. Lohn, 511 F.3d 960 (9th Cir. 2007).............................................5

10  Gaule v. Meade, No. A05-0020 CV, 2005 U.S. Dist. LEXIS 39958 (D. Alaska Oct. 7, 2005) ... 12

11  Herrington v. County of Sonoma, 12 F.3d 901 (9th Cir. 1993).....................................................7

12  Hoffman v. Tonnemacher, 593 F.3d 908 (9th Cir. 2010) ......................................................6, 10

13  Lands Council v. Powell, 395 F.3d 1019 (9th Cir. 2005) ...........................................................12

14  Malama Makua v. Rumsfeld, 136 F. Supp. 2d 1155 (D. Haw. 2001) ..........................................6

15  Odima v. Westin Tucson Hotel, 53 F.3d 1484 (9th Cir. 1995)......................................................7

16  Presidio Golf Club v. Nati'l Park Serv., 155 F. 3d 1153 (9th Cir. 1998) ......................................8

17  Sierra Club v. Marsh, 769 F.2d 868 (1st Cir. 1985)...............................................................8, 9

18  Westchester Fire Ins. Co. v. Mendez, No. 2:05-CV-01417, 2010 U.S. Dist. LEXIS 66273

     (D. Nev. July 1, 2010) .........................................................................................................7

19  White v. Lee, 227 F.3d 1214 (9th Cir. 2000) ..............................................................................6

20

21

## STATUTES

22  16 U.S.C. §§ 1801-1891d.........................................................................................................2

23  42 U.S.C. §§ 4331-4335...........................................................................................................2

24  5 U.S.C. §§ 551-559................................................................................................................2

25

26

## RULES

27  Fed. R. Civ. P. 1 .....................................................................................................................6

# REGULATIONS

40 C.F.R. § 1508.27(b)(6) ................................................................ 8, 11

50 C.F.R. § 665.17(e)(1) ................................................................ 11

50 C.F.R. § 665.17(e)(2) ................................................................ 11

68 Fed. Reg 74,217, 74,218 (Dec. 23, 2003) ................................ 11

68 Fed. Reg. 44,745, 44,745 (July 30, 2003) ............................... 11

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE A RENEWED MOTION FOR SUMMARY JUDGMENT**

## I.   Introduction

Plaintiff hereby seeks leave of this Court to submit the attached renewed motion for summary judgment.  As discussed below, the Court may entertain such a successive motion for summary judgment.  Further, such a supplemental briefing is necessary on the grounds that:

1) The original briefing and hearing on summary judgment of Plaintiff's NEPA claim was not able to focus on the ongoing and repeatable harms from the KBWF permit, which gave rise to this remand by the Ninth Circuit.

2) The second permit that Defendants issued to a second  aquaculture facility provides an expanded factual record that was not available when the parties submitted their cross motions for summary judgment.

Plaintiff asks for this Court to allow the submission of the attached motion for summary judgment (Exhibit "F") and for its consideration thereof.

## II.   Background and Procedural Posture

This case returns to this Court after remand on January 24, 2014 by the U.S. Court of Appeals for the Ninth Circuit.  Plaintiff Food & Water Watch, Inc. ("Plaintiff"), a non-profit organization that advocates for safe and sustainable seafood on behalf of its members, originally brought this suit on August 2, 2011 challenging a fishing permit, called a Special Coral Reef Ecosystem Fishing Permit ("Special Permit"), that the Defendants issued to Kona Blue Water Farms, Inc. ("KBWF").  Plaintiff challenged Defendants' issuance of the Special Permit to the aquaculture facility (the "Velella I") contending that it was not authorized by the

1   Magnuson Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-

2   1891d (2012) ("MSA") and was issued in violation of the Administrative Procedure

3   Act, 5 U.S.C. §§ 551-559 (2012) ("APA"), and the National Environmental Policy

4   Act, 42 U.S.C. §§ 4331-4335 (2012) ("NEPA").

5        On January 6, 2012 Plaintiff moved for summary judgment and on February

6   7, 2012 Defendants opposed such a motion and cross-moved.

7        In terms of its NEPA claim, in its papers supporting its summary judgment

8   motion, Plaintiffs demonstrated that, based on the information available at that time,

9   Defendants violated the law in failing to issue an Environmental Impact Statement

10   ("EIS") prior to issuing KBWF's Special Permit because they had unlawfully issued

11   a Finding of No Significant Impact ("FONSI") despite the substantial questions

12   surrounding the permit's effects.  (See Pls.' Amend. Mot. Summ. J. Each Claim

13   Compl. Injunctive And Declaratory Relief; Amend. Memo. P. & A. Supp. Thereof

14   (Doc. 26) ("Pls.' Memo.").)  Such effects included its highly controversial,

15   socioeconomic, and cultural impacts, in no small part due to the project acting as a

16   Fish Aggregating Device ("FAD") (see id. at 24) – which Defendants conceded

17   would occur and solely contested the extent thereof.  (Administrative R. ("AR") at

18   55.)  Defendants also violated NEPA by failing to adequately analyze the Velella's

19   precedential and growth-inducing impacts, as the project was the first-ever such

20   facility permitted under the MSA and could induce the growth in the number and

21   size of aquaculture facilities off the coast of Hawaii and elsewhere.  (See id. at 26-

22   27.)

23        Defendants' main response to Plaintiffs' NEPA claims was that there was not

24   an identified future action for which this facility served as a precedent at the time it

25   was issued and that the agency could later study any future impacts.  (See Fed.

26   Defs.' Reply Supp. Their Cross-Mot. Summ. J. And Opp. Pls.' Mot. Summ. J. at 15

27   (Doc. 38.) ("Defs.' Reply").)  Defendants did not state how their EA addressed the

1   potential FAD impacts beyond the assertion that the project would be of limited

2   duration and effect. (See id. at 14.)

3          On March 6, 2012, in its reply brief on summary judgment, Defendants

4   argued that Plaintiffs' NEPA claims were moot because the experiment had

5   terminated. (Id. at 11.) This Court ordered the parties to brief the Court on the

6   justiciability of the claims given Defendants' proffer. (Doc. 39.)

7          On April 27, 2012, after briefing the justiciability of Plaintiff's claims and a

8   hearing, this Court denied the Plaintiff's motion for summary judgment and granted

9   Defendants' cross motion. (See Order Granting Defs.' Mot. Summ. J. And Den.

10   Pls.' Mot. Summ. J. (Doc. 46) ("Slip op.").) The Court did not reach the merits of

11   Plaintiff's NEPA claim, instead finding that the claim was moot because there was

12   no effective relief available given that the project was over and the disputed permit

13   had been terminated. (Id. at 16-17.)

14          Plaintiff appealed. In terms of this Court's determination that Plaintiff's

15   NEPA claims were moot, Plaintiff argued on appeal that this Court erred in not

16   recognizing the continuing harm from the terminated project. (Opening Br. of Pl.-

17   Appellant FWW at 61-64 (Dkt. Entry 9-1) ("Pl.'s App. Br.").) More specifically,

18   just as in Anderson v. Evans, 371 F. 3d 475, 493, 502 n.27 (9th Cir. 2004), where

19   the Ninth Circuit stated that a failure to consider the precedential effects of

20   following a new process for approving a project constitutes a continuing harm

21   defeating mootness, here, Defendants' failure to adequately analyze how the first-

22   ever issuance of fishing permit to a commercial fish farm facility under the MSA

23   would have significant impacts. (Id. at 62-63.) Defendants also failed to adequately

24   analyze effects stemming from the way in which the permit was issued, as it will

25   signal to other and potentially larger aquaculture projects that they can take

26   advantage of the Defendants' streamlined special permitting provisions. (Id.)

27   Likewise, Plaintiff argued that Defendants' failure to consider the growth-inducing

1    effects from issuing KBWF a permit under the MSA was an ongoing harm that

2    rendered Plaintiff's claims live.  (Id. at 63.)

3        Plaintiff also argued that this Court erred in finding effective declaratory and

4    injunctive relief unavailable for Plaintiff's NEPA claim because it failed to consider

5    these ongoing harms.  (Id. at 64-66.)  Defendants could therefore not meet their

6    heavy burden to demonstrate that meaningful declaratory and injunctive relief was

7    unavailable to remedy Defendants' failure to adequately study the KBWF permit's

8    precedential and growth-inducing impacts.  (Id.)  For example, Defendants could not

9    show why a court could not afford Plaintiff complete relief by ordering Defendants

10   not to issue any other Special Permit for an aquaculture facility without conducting

11   an adequate NEPA analysis that fully considers the precedential and growth-

12   inducing effects of such a permit.  (Id. at 65-66.)

13       Finally, Plaintiff argued that this court should have applied the "capable of

14   repetition yet evading review" exception to Plaintiff's NEPA claim because the

15   permit was for a limited one-year duration and Plaintiff would likely receive the

16   same injuries underlying Plaintiff's NEPA claim for the Velella I, including from

17   Defendants' failure to adequately study the precedential and growth-inducing effects

18   of the permit issuance.  (Id. at 66-68.)

19       Defendants countered in their brief that since the project was terminated and

20   established no binding precedent, there was no effective relief available to the

21   Plaintiffs and the claim was moot.  (Br. Fed. Appellees at 54-56 (Dkt. Entry 24).)

22   They also argued that Plaintiff's claims were not capable of repetition but evading

23   review because the Plaintiff's challenges to NEPA compliance were predominantly

24   factual and tied to the specific activity proposed in a permit application and

25   administrative record.  (Id. at 56-57.)

26       In an October 29, 2013 memorandum, the Court of Appeals disagreed with

27   the Defendants on the mootness of Plaintiffs' NEPA claim and reversed and

1   remanded this Court's decision.  It found that the "capable of repetition but evading

2   review" applied because:

4           The claim fits both criteria necessary to meet the exception: (1) A "reasonable
            expectation" exists that FWW will be subject to the same alleged injury due to
5           Kona Blue's intended second permit application, and (2) the alleged injury is
            "inherently limited in duration" such that it will likely become moot before
6           any subsequent federal litigation is completed.

8   (Memo. at 3 (Dkt. Entry 50-1) (attached as Ex. A) (citing Ctr. for Biological

9   Diversity v. Lohn, 511 F.3d 960, 965 (9th Cir. 2007).)

10           Immediately after this decision, but prior to the Ninth Circuit's mandate,

11  Defendants issued another Special Permit for another aquaculture facility, the

12  Velella II project.  78 Fed. Reg. 66,683 (Nov. 1, 2013).  (See also Mandate, attached

13  as Ex. G.)  The permit was issued to Kampachi Farms, LLC, ("Kampachi"),

14  KBWF's successor in interest for the Velella I.  (See "Environmental Assessment

15  for the Issuance of a Special Fishing Permit to Authorize the Use of an Anchored

16  Pod to Culture and Harvest a Coral Reef Ecosystem Management Unit Species,

17  Seriola rivoliana, in Federal Waters West of Hawaii Island" (RIN 0648-XC791)

18  October 25, 2013 ("Kampachi EA") (attached as Ex. B).)  While Plaintiff has not

19  challenged the issuance of this permit, the record supporting the approval are both

20  relevant and admissible for the Plaintiff's NEPA claim for issuing the Special

21  Permit to Velella I, as discussed below.

22           Now upon remand, this Court has Plaintiff's NEPA claims surrounding

23  Velella I before it, and, for this claim Plaintiff seeks supplemental briefing for

24  summary judgment, based not only on the Velella I EA's administrative record, but

25  also on the relevant and admissible documents supporting the Velella II.

## III.   Argument

### A.   A Renewed Summary Judgment Motion Is Proper.

In 2010 the Ninth Circuit, "[held] explicitly that district courts have discretion to entertain successive motions for summary judgment." Hoffman v. Tonnemacher, 593 F.3d 908, 911 (9th Cir. 2010). "[I]n effect, the possibility of summary judgment remains on the table even after a district court has denied a summary judgment motion because that order is subject to reconsideration by the court at any time." Id. (quotation marks and citation omitted). "Consequently, allowing a party to file a second motion for summary judgment is logical, and it fosters the 'just, speedy, and inexpensive' resolution of suits." Id. (citing Fed. R. Civ. P. 1 (2013)).

A successive motion for summary judgment is particularly appropriate where the Court could not have reached the merits of a claim because it determined it lacked jurisdiction to do so. See Malama Makua v. Rumsfeld, 136 F. Supp. 2d 1155, 1159 (D. Haw. 2001) ("[R]ipeness and mootness both pertain to a federal court's subject matter jurisdiction under Article III of the United States Constitution . . . ") (citing White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000) (mootness is jurisdictional).

After this Court ordered supplemental briefing on the issue of mootness (Doc. 39) and those briefs were filed (Docs. 40 and 41), this Court ruled that the NEPA claim was moot, i.e., that it lacked subject matter jurisdiction to address the NEPA claim. Therefore, this Court's order is properly construed as an order to dismiss, and it cannot be construed as an order granting of Defendants' motion for summary judgment on the NEPA claim. Cf. Capitol Industries-EMI, Inc. v. Bennett, 681 F.2d 1107, 1118 (9th Cir. 1982) ("An order of dismissal, and not a Rule 56 motion for summary judgment, is the proper method for disposing of an action in which subject matter jurisdiction is lacking. . . . . It is, therefore, error to rule on a summary

1    judgment motion or any other matter going to the merits where a court determines

2    that it lacks jurisdiction over the subject matter.")

3          A renewed motion for summary judgment can be brought after remand, where

4    a district court may decide anything not foreclosed by the appellate court's mandate.

5    See, e.g., Westchester Fire Ins. Co. v. Mendez, No. 2:05-CV-01417, 2010 U.S. Dist.

6    LEXIS 66273, at *10–11 (D. Nev. July 1, 2010) (citing Herrington v. County of

7    Sonoma, 12 F.3d 901, 904 (9th Cir. 1993)). "When a case has been decided by an

8    appellate court and remanded, the court to which it is remanded must proceed in

9    accordance with the mandate and such law of the case as was established by the

10   appellate court." Odima v. Westin Tucson Hotel, 53 F.3d 1484, 1497 (9th Cir.

11   1995). A mandate "leav[es] any issue not expressly or impliedly disposed of on

12   appeal available for consideration by the trial court on remand." Id. (quotation

13   marks and citation omitted).

14

15   B.    Supplemental Briefing on Summary Judgment Is Necessary To
           Address the NEPA Issues for Which There Remains Ongoing And
16         Repeatable Harms.

17

18         The original briefing on summary judgment for Plaintiff's NEPA claim

19   primarily addressed the controversial, uncertain, unique, and unknown risks of the

20   KBWF facility on the environment. The briefing also addressed the precedent

21   created by the permit by, among other things, pointing out that the EA did not

22   adequately discuss how issuing the permit would affect future projects. At its core,

23   Defendants' response to the latter issue was simply that "NMFS did not know

24   whether there would be any similar future permit applications." (Defs.' Reply at 15.)

25         But Plaintiff and Defendants' summary judgment arguments were otherwise

26   almost entirely focused on all of the NEPA issues because they were all still

27   indisputably live at that time of the briefing. The prospect that Plaintiff's NEPA

1   claims might be dismissed as moot only arose in the Defendants' final reply in

2   support of its cross summary judgment. (Defs.' Reply at 11.) This was the final

3   briefing of the merits and was filed long after Plaintiff had already briefed the Court

4   for summary judgment the merits of their NEPA claim. Therefore, while Plaintiffs

5   raised the narrower set of issues where the harms were ongoing and repeatable, the

6   parties dedicated their time and space to issues not yet crucial until the Ninth

7   Circuit's remand.

8        For example, while Plaintiff cites to the Sierra Club v. Marsh, 769 F.2d 868,

9   879 (1st Cir. 1985) decision in its opening brief, it did not devote much discussion

10   on the negative treatment of an agency's position to consider effects at a later time.

11   Marsh directly rebuts Defendants' contention that they conducted sufficient analysis

12   of precedential effects of Velella I under NEPA and 40 C.F.R. § 1508.27(b)(6)

13   (2013) because any subsequent project will also undergo environmental review.

14   The First Circuit in Marsh found that such subsequent review was not enough

15   because any such later consideration would be unlikely to offer decision makers a

16   meaningful choice about whether to proceed. 769 F.2d at 879.

17        The Marsh court's interpretation of § 1508.27(b)(6), including its purpose to

18   avoid "the thoughtless setting in motion of a chain of bureaucratic commitment that

19   will become progressively harder to undo the longer it continues[,]" was adopted by

20   the Ninth Circuit and it is directly applicable to the present case. See Presidio Golf

21   Club v. Nati'l Park Serv., 155 F. 3d 1153, 1162-63 (9th Cir. 1998) (quotation marks

22   and citation omitted) (accepting the rationale of Marsh but distinguishing it on the

23   grounds that it was a "unique, independent project"). Here, the precedent of issuing

24   KBWF a permit under the MSA means that future decisionmakers will not have

25   much of a choice but to proceed by issuing Special Permits to aquaculture facilities

26   under the MSA, *even if this permitting process itself* spurs development and causes

27   harmful environmental effects. While Defendants may be able to consider the

---

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

1   effects of individual projects and even reject some, they will no longer have the

2   meaningful choice to be able to reject a permit application simply because of the

3   environmental impacts from issuing a permit under the MSA.  Like with the bridge

4   and causeway at issue in Marsh, after the Velella I permit, that die has already been

5   cast.[1]

6         This issue received scant attention when the case was originally before this

7   Court.  Then, after Defendants raised the mootness issue, all subsequent briefing

8   was solely focused on mootness, not the merits of Plaintiff's NEPA claims.  (See

9   Fed. Defs.' Supplemental Br. Mootness (Doc. 40); Pls.' Supplemental Br.

10  Justiciability (Doc. 41).)  Indeed, this Court's hearing focused on mootness,

11  particularly on whether the project had in fact terminated.

12        Emblematic of the lack of briefing and hearing on the ongoing and repeatable

13  harms caused by Defendants' NEPA violations is this Court's determination that

14  Plaintiff's claims were moot and the lack of continuing harm from Defendants'

15  alleged NEPA violations.  (See Slip op. at 17 ("Plaintiffs do not allege any

16  continuing harm resulting from the issuance of the permit. They identify no

17  secondary harm that can be mitigated by now requiring Defendants to prepare an

18  EIS."))

19        The Ninth Circuit disagreed with this conclusion, however.  (Memo. at 3.)  It

20  found a reasonable expectation that Plaintiffs would suffer the same harms with

21  subsequent projects as with the Velella I.  (Id.)  It necessarily follows that the Ninth

22  Circuit rejected the contention that there was no relief available to address such

23  _____

24  [1] Also indicative that these issues were not fully briefed was that upon appeal, the
    Defendants for the first-time ever raised a new theory not advanced before this

25  Court, that there were no potential growth inducing impacts because the potential

26  growth in aquaculture was not the type of impacts contemplated by NEPA and the
    Council on Environmental Quality's regulations.  (See Br. Fed. Appellees at 56.)

27

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

1    repeatable and ongoing harms from Defendants' NEPA violations, including their

2    alleged failure to adequately assess the precedent-setting and growth-inducing

3    impacts from issuing the fishing permit to an aquaculture facility under the MSA.

4         Thus, further briefing is needed on these issues, including the forms of

5    adequate relief, as this Court has expressed that they were neither adequately briefed

6    nor considered by this Court for summary judgment.

7

8         C.   Supplemental Briefing on Summary Judgment Is Necessary Because of
              the Expanded Factual Record From the Velella II's Approval.

9

10        Additional briefing is also needed because of the expanded factual record that

11   exists because of Defendants' approval of a Special Permit for the Velella II facility.

12        The Ninth Circuit has determined that successive motions for summary

13   judgment are particularly appropriate when, such as here, there is an expanded

14   factual record:

15        In holding that district courts have discretion to permit successive motions for
16        summary judgment, we join at least five of our sister circuits. . . . We adopt
          the sound view, expressed by several of those circuits, that a successive
17        motion for summary judgment is particularly appropriate on an expanded
18        factual record.

19   Hoffman, 593 F.3d at 911 (quotation marks and citation omitted).

20        The expanded record in this case demonstrates that the Defendants' basis for

21   blindly refusing to review Velella I's precedent-setting, growth-inducing, and FAD

22   impacts in an EIS were completely fictional and utterly without merit.

23        At the time of its summary judgment filing, Defendants argued that there

24   were no potential precedential effects of the project because "Plaintiffs have not

25   identified a future action for which the EA establishes a precedent." (Fed. Defs.'

26   Memo. Supp. Its Combined Cross-Mot. Summ. J. And Opp. Pls.' Mot. Summ. J. at

27   21 (Doc. 32-1).) And, Defendants argued that Plaintiffs have not demonstrated that

PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

10

1   the Special Permit "established a precedent or a decision in principle for future

2   permit applications." Id. Defendants reply brief simplistically argued that their EA

3   was sufficient because "NMFS did not know whether there would be any similar

4   permit applications." (Defs.' Reply at 15.)

5       But the Velella II Special Permit has now been issued and even the small

6   sample of documents supporting it that Plaintiffs have obtained clearly demonstrates

7   that the Velella I's Special Permit "establish[ed] a precedent for future actions with

8   significant effects or represent a decision in principle about a future consideration"

9   and thus should have required an EIS under NEPA and 40 C.F.R. § 1508.27(b)(6).

10      Perhaps most indicative of the precedent set by Velella I is how the two

11  projects' respective EAs assessed the possible alternatives. In the Velella I EA,

12  Defendants discussed (but did not analyze in detail) the possible alternative of

13  issuing KBWF an Experimental Fishing Permit ("EFP"). (AR at 30.) The agency

14  had previously determined that it had the authority to issue EFPs to aquaculture

15  facilities.[2] Unlike the Special Permit regulations, Defendants' EFP regulations

16  require substantial regional council involvement, and such permits are

17  nontransferable and require notice and opportunity for public comment via the

18  Federal Register. See 50 C.F.R. § 665.17(e)(1)-(2) (2013). In the Velella I Project's

19  EA, the Defendants rejected such an alternative and instead selected the Special

20  Permit option because "NOAA's [sic] Aquaculture Policy supports the regional

21  development of aquaculture, as managed under respective [Fishery Management

22  Plans/Fishery Ecosystem Plans]." (AR 30.) In other words, Defendants chose to

_____

24  [2] See, e.g., 68 Fed. Reg. 44,745, 44,745 (July 30, 2003) (indicating that Defendants
    were considering issuing an EFP for an aquaculture facility); 68 Fed. Reg 74,217,
25  74,218 (Dec. 23, 2003) (rejecting the EFP application in part because of the Gulf of
26  Mexico Fishery Management Council was considering amending its Fishery
    Management Plan to include aquaculture).
27

1   issue a Special Permit because to do so would better advance their aquaculture

2   policy, which seeks to encourage its regional development.

3       Defendants' Velella II EA, on the other hand, *fails to even mention the*

4   *possibility* of issuing an EFP for the project.[3]  <u>See</u> Kampachi EA at 24-26.  Thus,

5   Defendants' decision to issue a Special Permit rather than an EFP for the Velella I is

6   no doubt a precedent that could have significant environmental effects, as

7   Defendants' determination that the Special Permit would better serve regional

8   aquaculture development resulted in Defendants not even considering the EFP

9   option for Velella II.  Indeed, the Velella II EA shows that the Velella I permit

10  decision has foreclosed such an alternative.

11

12

---

13  [3] The Velella II EA and its administrative record may be considered by this Court,

14  as evidence "necessary to determine whether the agency has considered all relevant

15  factors and has explained its decision," and because "plaintiffs make a showing of

    agency bad faith" with the Velella I project.  <u>See</u> <u>Lands Council v. Powell</u>, 395 F.3d

16  1019, 1030 (9th Cir. 2005) (quotation marks and citation omitted); <u>Gaule v. Meade</u>,

    No. A05-0020 CV, 2005 U.S. Dist. LEXIS 39958, at *2–3 (D. Alaska Oct. 7, 2005).

17  More specifically, the Velella II EA contains information, which, while post-

18  decisional, is admissible when "used to show that the agency 'proceeded upon

    assumptions that were entirely fictional or utterly without scientific support.'"

19  <u>Gaule</u>, 2005 U.S. Dist. LEXIS at *6 (quoting <u>Association of Pacific Fisheries v.</u>

20  <u>EPA</u>, 615 F.2d 794, 812 (9th Cir. 1980)).  With the Velella II EA's failure to discuss

    an EFP alternative, for example, this new information reveals not only that what was

21  before the Defendants was wrong when considered, *i.e.*, that there would be no

22  future projects, but also that their assumption that there would be no precedent set

    by the permit's issuance was entirely fictional.  <u>Cf.</u> <u>Airport Cmtys. Coal. v. Graves</u>,

23  280 F. Supp. 2d 1207, 1213 (W.D. Wash. 2003) (allowing the consideration of new

24  information because it "revealed that the information in the record was wrong at the

    time that it was put in the record and considered . . ."); <u>Am. Army Servs. Corp. v.</u>

25  <u>United States</u>, 106 Fed. Cl. 714, 724-25 (2012) (allowing the inclusion of

26  information that directly refuted the assumptions underlying the Defendants'

27  determination).

---

1        Because the full extent of Defendants' precedent-setting decision of issuing

2   KBWF a Special Permit was fully revealed by the expanded factual record that did

3   not exist at the time this Court was initially briefed on summary judgment,[4] this

4   Court should provide supplemental briefing on this issue.

5        The expanded record also demonstrates the extent to which Defendants failed

6   to adequately analyze the cumulative and growth-inducing effects from issuing a

7   Special Permit to the Velella I aquaculture facility.  Defendants' Velella I FONSI

8   contends that the permit would not allow an expansion of fish farming, because "the

9   approved Hawaii FEP and NMFS regulation specifically provide for the *rare*

10

11   [4] Indeed, the expanded record that Defendants relied on in approving Velela II

12   included further evidence from Kampachi that the manner in which Velella I was
    permitted had precedent-setting and growth-inducing impacts.  (See Sims, N. and G.

13   Key. "Fish without footprints – beta-test of the first unanchored fish pen

14   and the first marine fish culture in U.S. Federal waters. Final Report for Illinois
    Soybean Association, International Copper Association, Ocean Farms Technologies,

15   and NOAA" at 3, 10. (Kampachi Report") (attached as Ex. C) (referenced by

16   Kampachi EA at 96) ("There are now two primary impediments to [aquaculture's]
    expansion in U.S. waters: regulatory constraints, and scalability challenges. Under

17   the current regulatory constraints, offshore aquaculture operations are confined to

18   state waters in a few jurisdictions (Hawaii, Washington, Maine), and even there
    require lengthy permit processes for granting of leases of submerged lands for farm

19   sites and for attendant operating permits. Opposition. . . can result in lengthy lease-

20   granting and permitting processes, and can often stymie requests for farm sites or
    farm expansion entirely. This presents a problem for offshore aquaculture

21   operations, which, as they necessarily scale up to satisfy global demand, will require

22   additional space. *** The first-ever issuance of a permit to [Velella I to] stock fish
    into a culture system in U.S. Federal waters was a huge step not only for the project,

23   but also for the industry.")  This post decisional evidence is admissible like the

24   Velella II's EA itself (see supra n. 3) because it may be used to show that the agency
    proceeded upon assumptions that were entirely fictional or utterly without support.

25   See Gaule, 2005 U.S. Dist. LEXIS 39958, at *9 (allowing in a affidavit of a

26   company's owner that discusses the company's economic viability because it would
    go to the agency's failure to adequately analyze it and is demonstrates that the

27   agency's assumptions were entirely fictional).

1 circumstance where, as here, an applicant demonstrating the requisite experience
2 may request the use of an unapproved gear type . . . . The current application is a
3 one-time permit limited in both scope and duration. . . [A]nd each such application
4 must undergo environmental review and coordination prior to an approval decision."
5 (AR 9 (emphasis added).)

6      The Velella II EA completely undermines the reasons for not studying the
7 Velella I's growth-inducing impacts. The Velella II became the second aquaculture
8 facility, by the second company, to receive a Special Permit in three years, thus
9 demonstrating that such a permit can no longer be considered rare. And yet the
10 Velella II EA completely ignores the possibility that the second permit application
11 was related to the KBWF's success in already securing a Special Permit with
12 Velella. Instead, Velella II's EA simply claims that any growth-inducing effects
13 from issuing a Special Permit would be limited to the project because it "is limited
14 in both duration and size" and subsequent "applications would be reviewed and
15 subject to independent environmental evaluation." (Kampachi EA at 75-76.) The
16 Velella II EA's very similar explanation as Velella I's EA for why there would be
17 no growth-inducing impacts from the projects, even in the face of the evidence of
18 spurred aquaculture development from Velella I's permit issuance, demonstrates
19 that Defendants simply refused to take the requisite hard-look at such potential
20 harmful impacts with Velella I (and it continues to do so with Velella II).

21      Similarly, the Velella II EA demonstrates that the agency failed to properly
22 consider the FAD impacts of the Velella I. Velella I's EA indicated that the
23 potential FAD impacts would not be significant because the project would be in an
24 offshore location and moving. (AR 38.) The expanded record supporting the
25 Velella II EA demonstrates that this was simply wrong, as the project attracted many
26 fishermen. This was in no small part due to the fact that the project had to operate
27 far closer to shore than KBWF originally indicated. Indeed, the record shows that

the facility encountered more than five times more vessels when it was close to shore, where the Velella II is now permitted, compared to when it was farther out.[5] (See letter from Zach Corrigan to Michael Tosatto at 4-5 ("FWW Velella II comments") (without exhibits) (attached at Ex. D).)

And despite this, and notwithstanding that the Velella II EA recognizes that the "during the 2011-2012 towed Velella trial, recreational, commercial and charter fishermen frequented the general area when the towed CuPod was within 12 miles from shore[,]" and that the Velella II is not, by design, in constant movement, Defendants' Velella II EA concludes that any impacts to fishermen would be negligible (Kampachi EA at 32, 55, 60), a conclusion primarily based on the fact that fishermen could fish near Velella II's array. (Id. at 60.) But Defendants have no indication that such FAD impacts would not be harmful to fishermen or the marine environment. For example, Defendants go so far as to contradictorily indicate that, *despite that there is no catch rate data from fishermen in and around the Velella I*, "observations by the . . . crew, divers, and an unpaid intern surveyor indicate that *catches around the Velella [I] compared favorably against catch rates around other FADs*." (Id. at 32 (emphasis added).)

Again, this shows that, no matter how the factual assumptions have changed for the Velella projects, Defendants refuse to conceive of any possible significant

---

[5] Again, this information from the Velella II's EA is admissible as it is relevant to whether Defendants considered all relevant factors and proceeded upon issuing the Velella I permit on the basis of entirely fictional assumptions (see supra n. 3). Cf. Stein v. Barton, 740 F. Supp. 743, 753 (D. Alaska 1990) (allowing the consideration of evidence undermining the effectiveness of mitigation measures to demonstrate whether or not Defendants proceeded on the fictional assumption that the application of such measures would prevent harm).

1   effects from the facilities.[6]  The expanded administrative record, including whatever

2   prompted Defendants to conclude that catch rates for fishermen in and around

3   Velella I are comparable to other FADs – without seemingly relying on any catch-

4   rate data – merit further briefing prior to summary judgment.

5

6   **IV.   Conclusion**

7         Because the supplemental briefing is necessary for the Court to decide this

8   case upon remand, as the Court has thus far entertained little to no briefing on the

9   continuing and repeatable harms from its permit, especially in light of the expanded

10  factual record from Defendants' approval of the Velella II permit, Plaintiffs

11  respectfully ask the Court for leave to consider the proposed Renewed Motion for

12  Summary Judgment.

13

14  DATED: February 27, 2014        Respectfully submitted,

15

16                                  THE GALLAGHER LAW GROUP PC

17                                  _____

18                                  David H. Lawton
                                    Attorneys for Plaintiff

19

20  _____

21  [6] Indeed, Defendants' own Habitat Conservation Division commented on the
    prospect that Velella II would have negative impacts as a FAD and recommended

22  that Kampachi quantify these effects.  Defendants rejected this recommendation,
    choosing only to "encourage," but not require, "the applicant to collect data on any

23  observed FAD effect for evaluating potential ecosystem impacts."  (Kampachi EA at

24  90.)  See also MEMORANDUM FOR RECORD. Department of the Army
    Environmental Assessment and Statement of Finding for Above-Numbered Permit

25  Application at 14 (attached as Ex. E) ("By letter dated 7 May 2013, [the State
    Historic Preservation Division] stated that their office did not concur with our

26  determination as the proposed undertaking could impact unknown 'traditional

27  fishing grounds known as koas' within the area of potential effect.")