IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| KAHEA, et al. | ) | CIVIL NO. 11-00474 SOM/KSC |
| | ) | |
| Plaintiffs, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY JUDGMENT, |
| vs. | ) | AND DENYING PLAINTIFFS' |
| | ) | MOTION FOR SUMMARY JUDGMENT |
| NATIONAL MARINE FISHERIES | ) | |
| SERVICE, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND
DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I.        **INTRODUCTION.**

Before the court are cross-motions for summary judgment
filed by Plaintiffs KAHEA and Food & Water Watch, Inc.,
(collectively, "Plaintiffs") and by Defendants National Marine
Fisheries Service ("NMFS") and various federal administrators
sued in their official capacities.  The cross-motions concern
Plaintiffs' remaining claim for violation of the National
Environmental Policy Act ("NEPA") (Claim Five) in the Complaint
filed on August 2, 2011.  The court grants Defendants' motion and
denies Plaintiffs' motion.

II.       **FACTUAL BACKGROUND.**

This case is here on remand from the Ninth Circuit.

Plaintiffs challenge a one-year Special Coral Reef
Ecosystem Fishing Permit ("SCREFP") issued by NMFS to Kona Blue
Water Farms (the "Special Permit") allowing Kona Blue to "stock,

culture and harvest" almaco jack (*Seriola rivoliana*) fish in federal waters off Kawaihae Harbor on the Big Island (the "Project" or the "Velella Concept"). Administrative Record ("AR") at 90; ECF No. 76, PageID # 1302; ECF No. 79-1, PageID # 1426.

### A.   The Project.

In seeking the Special Permit, Kona Blue proposed placing 2,000 almaco jack, a Management Unit Species, in a "CuPod," which is a brass-link mesh cage continuously towed behind a sailing vessel in federal waters. AR at 17, 19-20. The vessel was to remain in constant motion at least three nautical miles off-shore in deep waters (between 10,000 and 20,000 feet). Id. at 17, 20. The fish cultured in the CuPod were to be obtained from Kona Blue's land-based hatchery, and placed inside the CuPod in federal waters through the use of a support vessel. Id. at 19, 26. The fish were to be fed using a hose from the vessel to the CuPod. Id. at 25-26. The fish were expected to grow inside the CuPod, then to be removed and taken to land. Id. Staff and researchers were to monitor the fish and the Project's overall operation. Id. at 25.

The Project's purpose was to "test the feasibility of raising native marine fish species using a new gear-type (towed, floating pen) in the U.S. Exclusive Economic Zone (U.S. EEZ)." Id. at 17.

**B.   The Application and Special Permit.**

Kona Blue filed its application for a SCREFP with NMFS on November 5, 2010.  AR at 68.  Pursuant to 50 CFR § 665.224, Kona Blue was required to obtain a SCREFP for its Project because it was seeking to harvest a Hawaii coral reef ecosystem Management Unit Species with gear not specifically allowed by the governing regulations.  Id. at 17.

After reviewing Kona Blue's application, NMFS proposed the issuance of a limited, one-year permit to allow Kona Blue to test the feasibility of the Velella Concept.  Id. at 1.  As part of its review process, NMFS prepared a draft Environmental Assessment ("EA") that considered the environmental impact of the Project.  Id. at 4450.  The draft EA was available for public comment from March 17, 2011, to March 27, 2011.  Id. at 53. During the public comment period, NMFS received 41 unique responses, plus a response that was submitted numerous times as part of an email campaign.  Id. at 4.

On July 6, 2011, NMFS submitted its final EA.  Id. at 11.  Based on the EA, NMFS determined that the Project would not have a significant impact on the quality of the human environment and issued a Finding of No Significant Impact ("FONSI").  Id. at 3-10.  The Special Permit was subsequently issued.  Id. at 90.

## C.    Prior Proceedings.

On April 27, 2012, this court granted Defendants'
motion for summary judgment and denied Plaintiffs' motion for
summary judgment.  ECF No. 46.  This court concluded that
Plaintiffs' NEPA claim was moot, and granted summary judgment to
Defendants on the merits of Plaintiffs' remaining claims.

On June 21, 2012, Plaintiff Food & Water Watch, Inc.,
filed a notice of appeal to the Ninth Circuit.  ECF No. 48.  The
Ninth Circuit concluded that the "capable of repetition yet
evading review" exception to the mootness doctrine applied to
Plaintiffs' NEPA claim, and remanded the NEPA claim to this
court.  ECF No. 55, PageID # 953.  The Ninth Circuit affirmed
this court's disposition of Plaintiffs' other claims.  Id.,
PageID # 952-53.

## D.    Cross-Motions for Summary Judgment.

The motions now before this court concern Plaintiffs'
argument that the Defendants violated NEPA by failing to prepare
an Environmental Impact Statement ("EIS") for the Project.  ECF
No. 76, PageID # 1300.  Plaintiffs contend the EA failed to
adequately consider: (1) the precedential effect of the Special
Permit; (2) the indirect, growth-inducing effects of the Project;
(3) the controversial nature of the Project; and (4) the effect
of the Project on cultural resources.  Id., PageID # 1306-16.
According to Plaintiffs, proper consideration of such issues

4

would have revealed substantial questions as to whether the Project would have a significant effect on the environment, thus requiring NMFS to prepare an EIS.

Defendants respond that the EA and FONSI complied with NEPA, and that the decision to forego an EIS is entitled to deference.  ECF No. 79-1, PageID # 1427-28, 1438.

Both parties seek summary judgment on Plaintiffs' NEPA claim.  See ECF No. 76; ECF No. 79.

III.    **STATUTORY FRAMEWORK.**

NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  Congress enacted NEPA to ensure that all federal agencies would factor environmental considerations into decisionmaking.  To achieve this goal, NEPA requires a federal agency to prepare an EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  "NEPA ensures that the agency . . . will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger public audience."  Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1212 (9th Cir. 1998) (brackets omitted).

If, as here, an agency's regulations do not categorically require or exclude the preparation of an EIS, the

5

agency must first prepare an EA to determine whether the action will have a significant effect on the environment. 40 C.F.R. § 1501.4. An EA is a "concise public document" that is less detailed than an EIS. See 40 C.F.R. § 1508.9; Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 757, (2004). An EA (1) "provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact"; (2) "[a]id[s] an agency's compliance with [NEPA] when no environmental impact statement is necessary"; and (3) "[f]acilitate[s] preparation of a statement when one is necessary." 40 C.F.R. § 1508.9(a). If the EA "shows that the agency action may significantly affect the environment, then the agency must prepare an EIS." W. Watersheds Project v. Abbey, 719 F.3d 1035, 1050 (9th Cir. 2013). If, however, the EA indicates that the action will not significantly affect the environment, then the agency may issue a FONSI. Id.

In determining whether an action will significantly affect the environment, an agency must consider both the "context" and "intensity" of the action. 40 C.F.R. § 1508.27; see also Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin., 538 F.3d 1172, 1185 (9th Cir. 2008). "Context" requires analysis of the action "in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

"Intensity" requires consideration of "the severity of impact."
40 C.F.R. § 1508.27(b). Factors that "should be considered in
evaluating intensity" are listed in 40 C.F.R. § 1508.27(b).

**IV.      STANDARD.**

**A.    Administrative Procedure Act.**

Because a private right of action is not available
directly under NEPA, challenges to agency action under NEPA are
reviewed under the Administrative Procedure Act ("APA").
<u>Sensible Traffic Alternatives & Res., Ltd. v. Fed. Transit Admin.
of U.S. Dep't of Transp.</u>, 307 F. Supp. 2d 1149, 1164 (D. Haw.
2004).

Under the APA, agency action that is "arbitrary" or
"capricious" must be set aside. 5 U.S.C. § 706; <u>see also</u> <u>Butte
Envtl. Council v. U.S. Army Corps of Eng'rs</u>, 620 F.3d 936, 945
(9th Cir. 2010). Review under the arbitrary and capricious
standard is "highly deferential, presuming the agency action to
be valid and affirming the agency action if a reasonable basis
exists for its decision." <u>Sacora v. Thomas</u>, 628 F.3d 1059, 1068
(9th Cir. 2010) (internal quotation marks and citation omitted).
"A reasonable basis exists where the agency considered the
relevant factors and articulated a rational connection between
the facts found and the choices made." <u>Arrington v. Daniels</u>, 516
F.3d 1106, 1112 (9th Cir. 2008) (internal quotation marks and
citation omitted). An agency's decision will only be set aside

if:

> [I]t has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Butte, 620 F.3d at 945 (internal quotation marks and citation omitted).  A court may not "infer an agency's reasoning from mere silence," but "[e]ven when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned."  Crickon v. Thomas, 579 F.3d 978, 982 (9th Cir. 2009) (internal quotation marks and citation omitted).

In reviewing a challenge under NEPA to an agency's determination that an EIS is not required, the court "employ[s] an arbitrary and capricious standard that requires [it] to determine whether the agency has taken a hard look at the consequences of its actions, based [its decision] on a consideration of the relevant factors, and provided a convincing statement of reasons to explain why a project's impacts are insignificant."  Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005) (internal quotation marks and citation omitted).

### B.  Summary Judgment.

Summary judgment shall be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (2010); see Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  However, in the context of reviewing an administrative decision under the APA, "there are no disputed facts that the district court must resolve."  Occidental Eng'g Co. v. I.N.S., 753 F.2d 766, 769 (9th Cir. 1985).  Instead, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  Id.; see also City & Cnty. of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997).  "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  Occidental, 753 F.2d at 770.

## V.  ANALYSIS.

### A.  NMFS Adequately Considered Whether Issuance of a Permit Would Establish a Precedent for Future Actions or Represent a Decision in Principle About a Future Consideration.

Plaintiffs argue that Defendants failed to adequately consider, pursuant to 40 C.F.R. § 1508.27(b)(6), how the Project and the Special Permit "establish an incentive and precedent for

9

more aquaculture permits in the federal waters off of Hawaii's coast and elsewhere without adequate environmental review." ECF No. 76, PageID # 1306. According to Plaintiffs, the Special Permit ensures that "future decisionmakers will not have much of a choice but to proceed by issuing this type of permit to other aquaculture facilities," and that this effect warranted preparation of an EIS. Id., PageID # 1311.

The court determines, however, that this factor was adequately considered in Defendants' EA, and did not require preparation of an EIS.

NMFS specifically noted concern that the Special Permit could "open NMFS to a flood of applications for permits by operators wishing to undertake oceanic aquaculture in federal waters" and could "automatically lead to applications for industrial-scale ocean culture activities." AR at 55. NMFS concluded, however, that such concerns were unwarranted because the Special Permit was a "one-time permit limited in both scope and duration." NMFS noted that, even assuming the "rare circumstance[s]" present in this case were present in another, the Special Permit would not set a precedent because "[e]ach application [must] be coordinated in accordance with the permit process, and would need to comply with all applicable laws including project-specific environmental review." Id.

As the Ninth Circuit has noted, "EAs are usually highly

specific to the project and the locale, thus creating no binding

precedent." Barnes v. U.S. Dep't of Transp., 655 F.3d 1124,

1140-41 (9th Cir. 2011). Relying on this concept, NMFS

reasonably concluded that the issuance of the Special Permit

would not create any obligation on its part, or on the part of

any other agency, to grant future permit applications, or to

refrain from issuing an EIS in response to any aquaculture

application. As the Ninth Circuit said in In Defense of Animals,

Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Department of

Interior, No. 12-17804, 2014 WL 1876986 (9th Cir. May 12, 2014):

> Plaintiffs claim the gather will establish a
> precedent for future actions with significant
> effects, by encouraging future roundups of
> this scope and intensity. However, this
> argument is foreclosed by Ninth Circuit law
> which holds that 'EAs are usually highly
> specific to the project and the locale, thus
> creating no binding precedent.' Thus, the
> BLM's finding of no significant impact in
> this case will not affect the BLM's NEPA
> analysis in future gathers.

Id. at *12 (internal quotation marks and citations omitted). See

also Fund For Animals v. Norton, 281 F. Supp. 2d 209, 234 (D.D.C.

2003) ("[A]pplications for permits are considered on an

individual basis thereby enabling the agency to make a meaningful

assessment with respect to future applications regardless of what

action it has taken on the . . . applications here." (internal

quotation marks and citations omitted)).

Contrary to Plaintiffs' assertions, there is no

evidence in the record suggesting that a future aquaculture application will be summarily approved, or the discretion of future decisionmakers constrained, as a result of the issuance of the Special Permit being examined here.  The Special Permit was granted with respect to a temporary, limited project.  See Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv., 947 F. Supp. 2d 1031, 1072 (D. Alaska 2013) (finding adequate agency's explicit statement in EA that its decision would not have precedential effect and that each future action had to be considered individually); Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Engineers, No. 3:10-CV-01129-AC, 2013 WL 1294647, at *13 (D. Or. Mar. 27, 2013) ("The issuance of this [regional general permit] does not set in motion any other future projects. Because any future [regional general permit] for gravel mining in Oregon will require independent consideration and approval and must stand on its own merits, no precedent has been set within the meaning of 40 C.F.R. § 1508.27(b)(6)."); Save Strawberry Canyon v. U.S. Dep't of Energy, 830 F. Supp. 2d 737, 756-57 (N.D. Cal. 2011) ("Here, the CRT project is a stand-alone project. . . . There is no indication that it will set in motion or spur commitment to any specific project . . . .  And there is no indication that it is related to any other projects such that another would follow on by reason of the CRT project.").

Plaintiffs' assertion that the Special Permit will

leave future decisionmakers with little choice but to approve aquaculture applications with inadequate environmental review is not supported by law or by the record, and NMFS's conclusion that no precedential effect was established because any future applications would be individually scrutinized is not arbitrary or capricious.

Sierra Club v. Marsh, 769 F.2d 868 (1st Cir. 1985), which the parties extensively discuss, does not require a different result. In that case, the court addressed a proposal to build a cargo port and causeway on Sears Island, an undeveloped island in Penobscot Bay, Maine. The court determined that "pressure to develop the rest of the island could well prove irreversible" given the existence of an "integrated plan" for development of Sears Island, including construction of an industrial park. Id. at 872. This concrete plan for further development, of which the proposal before the court was only a part, informed the court's conclusion that, under 40 C.F.R. § 1508.27(b)(6), "[e]ven if federal authorities were to have an opportunity to consider the environmental effects of the industrial park at a later time, that later consideration would be unlikely to offer the decisionmaker a meaningful choice about whether to proceed." Id. at 879.

The present case involves circumstances unlike those in Marsh. There is no evidence that there was any concrete plan to

establish additional aquaculture facilities at the time of the NMFS decision, and no indication that Kona Blue's Project was part of an integrated plan for further activities. The Ninth Circuit reads 40 C.F.R. § 1508.27(b)(6) as designed to "avoid the thoughtless setting in motion of a chain of bureaucratic commitment that will become progressively harder to undo the longer it continues." Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1162-63 (9th Cir. 1998) (internal quotation marks and citation omitted). The proposal in Marsh implicated this concern because it was part of a concrete, integrated effort to develop Sears Island, such that approval of part of the plan naturally provided the remainder of the plan with significant momentum. Analogous circumstances are not present in this case.

Plaintiffs also appear to argue that the Special Permit issued to Kona Blue establishes a precedent by precluding NMFS from using the Experimental or Exempted Fishing Permit ("EFP") process rather than the SCREFP process for future aquaculture applications. ECF No. 76, PageID # 1311. Plaintiffs, however, fail to demonstrate how NMFS's determination that a SCREFP was the appropriate authorization for this particular project in any way prevents NMFS from later determining that the EFP process is warranted for a different future proposal.

At the hearing on the present motions, Plaintiffs' counsel asserted that use of the SCREFP process for Kona Blue's

14

Project "nullifies" the EFP process because it sets a precedent
that the EFP process need never be used.  It is unclear, however,
why this is necessarily the case.  Not only have Plaintiffs
failed to provide evidence to support this assertion, their
argument assumes that future applications will mirror Kona Blue's
application.  The EA notes that a SCREFP was appropriate in this
case because the Project involved a Management Unit Species and
use of an unapproved gear-type.  <u>See</u> AR at 30.  Even if a future
application were to also involve a Management Unit Species and
use of an unapproved gear-type, the determination that the
precise circumstances presented by the Project fit the SCREFP
process does not require any future project to follow the SCREFP
process if other circumstances differ from those presented by
Kona Blue's application.  Plaintiffs' argument assumes a future
application identical to Kona Blue's application.  If the danger
of setting a precedent for a possible future identical project
were enough to trigger the EIS requirement, an EIS would be
necessary for nearly every project.

At the hearing on the present motions, Plaintiffs'
counsel also argued that the EA should have addressed the
regulatory alternatives for permitting of the Project.
Specifically, Plaintiffs' counsel asserted that NMFS should have
analyzed the difference between the SCREFP and EFP processes as
applied to the Project.  However, Plaintiffs' counsel cited no

authority for the proposition that an EA must address the various regulatory routes available.  The purpose of an EA is to analyze the environmental effects of a project and to determine whether an EIS is required, rather than to analyze which permitting process is appropriate.  Further, even assuming analysis of alternative regulatory routes is necessary, NMFS did in fact include a discussion in the EA as to why the SCREFP process was the appropriate choice.  See AR at 30.

NMFS adequately considered the precedential effect of the Project pursuant to 40 C.F.R. § 1508.27(b)(6) and reasonably concluded that an EIS was not required.

### B.   NMFS Adequately Considered the Project's Cumulative and Indirect, Growth-Inducing Impacts.

Plaintiffs argue that the EA failed to consider adequately the cumulative impact and the indirect, growth-inducing impact the Project would have on aquaculture development, and that those impacts warranted preparation of an EIS.  ECF No. 76, PageID # 1311.

"Cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions."  40 C.F.R. § 1508.7.  In considering cumulative impact, an agency must provide "quantified or detailed information that results in a useful analysis."  Ctr.

for Envtl. Law & Policy v. U.S. Bureau of Reclamation, 655 F.3d
1000, 1007 (9th Cir. 2011) (internal quotation marks omitted).
"General statements about possible effects and some risk do not
constitute a hard look absent a justification regarding why more
definitive information could not be provided." Id. (internal
quotation marks and brackets omitted).

Plaintiffs' contention that Defendants failed to
adequately consider the cumulative impact on the environment of
future aquaculture development in the region is without merit.
Although an agency is required to address "reasonably foreseeable
future actions," the future regional aquaculture development that
Plaintiffs fear was, at least when NMFS was considering the
Project, merely speculative and therefore did not have to be
addressed.  An action is "reasonably foreseeable" if it is a
"proposed action." N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d
969, 980 (9th Cir. 2006).  However, "[f]or any project that is
not yet proposed, and is more remote in time . . . a cumulative
effects analysis would be both speculative and premature." Lands
Council v. Powell, 395 F.3d 1019, 1023 (9th Cir. 2005).

In the present case, Plaintiffs fail to cite any
project proposed at the time the EA was being prepared that
indicates a failure by NMFS to adequately consider cumulative
impact.  Further, even assuming that an action need not be
enshrined in a specific proposal to be considered "reasonably

17

foreseeable," requiring an agency to analyze future aquaculture development based only on the assumption that further development will occur, and without any indication of the nature, scope, location, or timeline of any potential future projects, would result in considerable speculation. Defendants did not have to consider the general and undefined regional aquaculture development Plaintiffs cite as a cumulative impact and did not need to prepare an EIS in that regard.

Plaintiffs fare no better with respect to their indirect, growth-inducing impact argument. "Indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. Indirect effects "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." Id.

Plaintiffs contend that regional aquaculture development should have been analyzed as an indirect effect of Kona Blue's Project. This contention involves an attenuated causal connection. See Ctr. for Envtl. Law, 655 F.3d at 1011. As noted above, at the point NMFS was preparing the EA, Plaintiffs could only speculate about the expansion of aquaculture development. What Kona Blue's short-term, limited

Project might lead to required assumptions about a host of intermediate steps, including whether aquaculture projects would be proposed by private parties, and what the results would be of the permitting process and individualized environmental review of each proposal.  Identifying regional aquaculture development as an indirect effect of the Project assumes a causal relationship, when the only connection is speculative.  NEPA requires a "reasonably close causal relationship between the environmental effect and the alleged cause" that is lacking between regional aquaculture development and the Project.  Pub. Citizen, 541 U.S. at 767.  NMFS's failure to consider regional aquaculture development as an indirect effect of the Project was not arbitrary and capricious, and an EIS was not required on that basis.

> C.    **Plaintiffs Do Not Show That the Project Was Highly Controversial**.

This court is unpersuaded by Plaintiffs' argument that Defendants were required to prepare an EIS because the effects of the Project on commercial fishermen, charter fishermen, and practitioners of Hawaiian medicine were "highly controversial" under 40 C.F.R. § 1508.27(b)(4).

An action is "controversial" for the purposes of 40 C.F.R. § 1508.27(b)(4) if there is "a substantial dispute [about] the size, nature, or effect of the major Federal action."  Blue Mountains, 161 F.3d at 1212.  "A substantial dispute exists when

evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." Makua v. Rumsfeld, 163 F. Supp. 2d 1202, 1219 (D. Haw. 2001) (internal quotation marks and citations omitted). The mere existence of opposition to a project, however, does not indicate that a project's effects are "highly controversial." Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1536 (9th Cir. 1997) ("Controversy does not refer to the existence of opposition to a use."); see also N.C. v. F.A.A., 957 F.2d 1125, 1134 (4th Cir. 1992) (noting that letting opposition establish "controversy" would allow a "heckler's veto" to suffice for requiring EIS).

Plaintiffs fail to demonstrate that an EIS was required under 40 C.F.R. § 1508.27(b)(4). In support of their argument that the effects of the Project on commercial fishermen, charter fishermen, and practitioners of Hawaiian medicine were "highly controversial," Plaintiffs cite "comments of licensed fishermen and women, who expressed concerns that the project would harm their livelihoods[.]" ECF No. 82, PageID # 1519-20. However, only one letter from the Western Pacific Regional Fishery Management Council ("WPFMC") is noted by Plaintiffs. Considerably more supporting evidence should be available if the Project's effects were "highly controversial." See, e.g., Sierra Club v. Bosworth, 510 F.3d 1016, 1031 (9th Cir. 2007) ("Here, the

comments of several federal and state agencies submitted in
response to the Fuels CE raised substantial questions as to
whether the project would cause significant environmental harm
and expressed serious concerns about the uncertain risk, size,
nature, and effects of actions under the CE."); Sierra Club v.
U.S. Forest Serv., 843 F.2d 1190, 1193 (9th Cir. 1988) ("The
Sierra Club introduced affidavits and testimony of
conservationists, biologists, and other experts who were highly
critical of the EAs and disputed the Forest Service's conclusion
that there would be no significant effects from logging because
the sequoias could be protected and their regeneration enhanced.
This is precisely the type of 'controversial' action for which an
EIS must be prepared.").

        Further, the WPFMC letter itself does not offer much,
if any, support for Plaintiffs' contention.  The letter states:

> Both recreational and commercial fishing . .
> . use the proposed area off the Kona coast.
> This area being considered may have many
> conflicts with the large sportsfish fishery
> that utilizes the waters off of Kona, as well
> as any potential *Ko'a* (Hawaiian offshore
> fishing ground) that may be used by the
> Hawaiian community. . . .  To reduce
> conflicts with navigation, the Council
> suggests NMFS require that the applicant
> provide the coordinates of the project (to be
> delineated by NMFS) applicant and base the
> permit expiration date accordingly.

AR at 4246-47.  This letter raises some concerns and makes
suggestions, but does not establish the existence of a

substantial dispute or cast serious doubt on the agency's conclusions. In fact, the letter notes that the WPFMC "does not object to the permit application."

At the hearing on the present motions, Plaintiffs' counsel, asked to identify where the administrative record reflected the existence of a substantial dispute, cited to page 28 of the EA (AR at 38) and to a letter written by Plaintiff Food & Water Watch (AR at 5192).[1] Neither of these documents demonstrates the existence of a substantial dispute as to the effect of the Project on commercial fishermen, charter fishermen, and practitioners of Hawaiian medicine.

The cited page of the EA contains discussion of the Project's effects on the target and nontarget species, the effect of feeds and feedings on wild fish stocks, and the socioeconomic impact of the Project. The discussion on page 28 of the EA says that the fish in the CuPod are "unlikely" to escape, and that any escaped fish would probably have a "negligible" effect on other fish.

The letter Plaintiffs cite outlines Plaintiff Food & Water Watch's concerns about the Project, but by citing to it,

_____

[1] Counsel was not being required at the hearing to come up with record citations on short notice. Proceedings before the judge assigned to this case routinely involve the judge's issuance of written prehearing inclinations. That procedure was followed here and gave counsel notice that the court wanted such record citations and that counsel should be prepared to provide citations at the hearing. See ECF No. 90.

Plaintiffs are seeking to establish a substantial dispute by relying on their own expressions of opposition.

Plaintiffs also cite declarations by Charles Leslie and Krista Johnson to support their argument that a substantial dispute existed as to the effect of the Project. These declarations are not considered here because they are not part of the administrative record, and the court does not perceive any reason to go beyond the administrative record to consider them. See Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998) ("[R]eview of an agency decision not to issue an EIS is generally limited to review of the administrative record at the time the decision was made.").

Nor does Plaintiffs' discussion of Defendant Michael D. Tosatto's letter to Eric C. Schwaab show that the Project was "highly controversial." See AR at 118. Tosatto, NMFS's Regional Administrator, describes the Project as "controversial" only by way of acknowledging the existence of opposition. Tosatto's statement does not suffice to establish that the Project warranted an EIS because it was actually "highly controversial" for NEPA purposes as related to the impact on fisherman or practitioners of Hawaiian medicine.

**D. The Record Does Not Show That the Impact of the Project Was Highly Uncertain.**

Plaintiffs say that the impact of the Project on commercial fisherman, charter fisherman, and practitioners of

23

Hawaiian medicine was "*unknown* or of such a controversial nature that an EIS [had to] be conducted."  ECF No. 76, PageID # 1313 (emphasis added).  However, Plaintiffs' motion does not actually address the allegedly "unknown" nature of the effects of the Project.  Therefore, before the hearing, the court asked Plaintiffs' counsel to come to the hearing on the present motions prepared to clarify whether Plaintiffs were arguing that the effect of the Project on commercial fishermen, charter fishermen, and practitioners of Hawaiian medicine was "highly uncertain" pursuant to 40 C.F.R. § 1508.27(5).

Plaintiffs' counsel responded by directing the court's attention to pages 16 and 17 of Plaintiffs' memorandum in support of Plaintiffs' motion for summary judgment, even though the heading corresponding to those pages states that the discussion involves a different intensity factor rather than whether the Project's effects were "highly uncertain."  Pages 16 and 17 of Plaintiffs' memorandum include a quote from Ocean Advocates v. U.S. Army Corps of Engineers, 402 F.3d 846 (9th Cir. 2005): "Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data or where the collection of such data may prevent speculation on potential . . . effects." ECF No. 76, PageID # 1315.  This is not an analysis of "unknown" effects.

Nowhere do Plaintiffs identify what matters were
uncertain or what inquiry requires the collection of further
data.  When pressed by the court at the hearing, Plaintiffs'
counsel pointed to one page of an opposition letter submitted to
NMFS by Plaintiff Food & Water Watch (AR at 5192), but that page
does not reflect the existence of uncertainty as to any effect of
the Project.  It merely reflects Plaintiffs' opposition to the
Project.

Thus, even assuming Plaintiffs intended to argue that
the effects of the Project are "highly uncertain" pursuant to 40
C.F.R. § 1508.27(5), Plaintiffs have failed to adequately support
that argument.

### E.   NMFS Adequately Considered the Project's Effect on Cultural Resources.

Contrary to Plaintiffs' assertions, NMFS adequately
considered the effect of the Project on Native Hawaiian fishermen
and their fishing grounds, and NMFS was not required to prepare
an EIS on that basis.

While section 4.13 of the EA addresses the effect of
the Project on cultural resources, sections 1.31, 3.3, 4.8, and
other sections address the effect of the Project on fishermen and
their activities.  See AR at 21, 33, 34, 39.  NMFS states, for
example:

> The operation would not be expected to
> negatively affect other fishermen and
> communities because of the small size of the

array and its location beyond 3nm and outside
of the majority of popular fishing areas.
The nature of the drifting array is expected
to attract various pelagic fish species and
other marine species while acting as a FAD.
This has the potential to attract offshore
fishermen and other vessels to the array.
Fishermen would be expected to observe a safe
distance from Kona Blue's operation, just as
would be done for other fishing operations
that exist in waters around Hawaii.
Likewise, Kona Blue will attempt to stay
clear of existing FADs to the degree possible
while respecting other fishermen that utilize
the same area of the ocean.  Permitting the
proposed activity would not grant Kona Blue
special rights, or a lease, to exclusive use
of any part of the ocean.  The entire action
area would remain open to all ocean
activities to the degree it is accessible
prior to the issuance of a permit.

AR at 39.  This discussion, along with the discussion in other

sections of the EA noted above, demonstrates that NMFS took a

"hard look" at the effect of the Project on fishermen and their

activities.

Although Plaintiffs specifically refer to the effect of

the Project on Native Hawaiian fishermen and their fishing

grounds, Plaintiffs fail to offer any explanation as to why those

potential concerns were not adequately addressed by the EA's

general discussion of the Project's effects on fishermen and

fishing grounds.  Plaintiffs therefore fail to demonstrate that

NMFS's assessment of this issue was arbitrary or capricious.

# VI.    CONCLUSION.

Plaintiffs' motion for summary judgment is denied, and Defendants' motion for summary judgment is granted.  This disposes of all claims and all parties in this action. Accordingly, the Clerk of Court is directed to enter judgment in favor of Defendants and to close this case.


IT IS SO ORDERED.

DATED: Honolulu, Hawaii, July 24, 2014.




/s/ Susan Oki Mollway
Susan Oki Mollway
Chief United States District Judge


KAHEA, et al. v. National Marine Fisheries Service, et al., Civ. No. 11-00474 SOM/KSC; ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT